EXHIBIT
A

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

SU2025CV001918

AUG 28, 2025 01:14 PM

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

## IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NUMBER: |
| | * | |
| NORFOLK SOUTHERN CORP., NORFOLK SOUTHERN RAILWAY COMPANY, CENTRAL OF GEORGIA RAILROAD COMPANY, THE SOUTH-WESTERN RAIL ROAD COMPANY, GENESEE & WYOMING RAILROAD SERVICES, INC., COLUMBUS & CHATTAHOOCHEE RAILROAD, INC., and GEORGIA SOUTHWESTERN RAILROAD, INC., | * | _____ |
| | * | JURY TRIAL DEMANDED |
| Defendants. | * | |

## COMPLAINT

COMES NOW Plaintiff Consolidated Government of Columbus, Georgia (hereinafter "CCG"), by and through its undersigned legal counsel, and files this its Complaint containing the following causes of action against Defendants Norfolk Southern Corporation, Norfolk Southern Railway Company, Central of Georgia Railroad Company, The South-Western Rail Road Company, Genesee & Wyoming Railroad Services, Inc., Columbus & Chattahoochee Railroad, Inc., and Georgia Southwestern Railroad, Inc. (hereinafter collectively "Railroad"), showing this Honorable Court as follows:

### INTRODUCTION

This is an action to recover public land which the Railroads contemplated and agreed in writing to return to CCG more than 175 years ago. In 1847, the Railroad requested from CCG real property "for the purpose of locating a Depot" in Columbus, Georgia. After considering the public

benefits which a passenger depot would provide to the citizens of Columbus, CCG—in cooperation with the State of Georgia—conveyed to the Railroad fee simple determinable title to a tract of public land in Columbus for depot purposes. The Railroad voluntarily accepted the property under these conditions, and has now received the benefit of this agreement with CCG for nearly two centuries. A deed was not given to the Railroad; instead, CCG passed resolutions conveying title to the Railroad subject to specific limitations, and those resolutions were recorded in the hand-written minutes of the city council meetings. With the intent to protect the public land and ensure it would always be used to benefit the public, CCG included a reversionary interest to itself for the property which would be triggered by, amongst other events, the Railroad ceasing to use the property for depot purposes.

This transaction occurred more than once between 1847 and 1886 resulting in the creation of two railyards in Columbus, Georgia. These railyards are composed of various, distinct parcels all subject to terms of reversion in favor of CCG. For more than a century, the railyards were used more or less as CCG and the Railroad intended with the benefits of that use flowing to the citizens of Columbus. Then, the Railroad ceased passenger services in Columbus and sold and/or demolished its depots. This triggered the terms of reversion, and title to both railyards is now vested in CCG. However, the Railroad remains on the property and uses it for its own non-public purposes which do not include the operation of a depot.

The purpose of this action is to rightfully restore control of the public land composing the railyards to CCG, and to recover for the losses and damages CCG has suffered by the Railroad's continued use of the property.

## PARTIES

1.

Plaintiff CCG is a local government entity formed by the consolidation of the City of Columbus, Georgia, and the County of Muscogee in the State of Georgia.

2.

CCG holds legal title to, but not control or possession of, the real property subject to this action which is located in Muscogee County, Georgia, and is currently occupied by the Railroad.

3.

Defendant Norfolk Southern Corporation (hereinafter "NS Corp.") is a Georgia domestic corporation which may be served with legal process through its registered agent, J. Steven Stewart, who is located at 577 Mulberry St. 1500, Macon, Georgia 31201 and who may be served at this address. NS Corp. is in unlawful possession and control of real property subject to this action.

4.

Defendant Norfolk Southern Railway Company (hereinafter "NS Railway") is a Georgia domestic corporation which may be served with legal process through its registered agent, J. Steven Stewart, who is located at 577 Mulberry St. 1500, Macon, Georgia 31201 and who may be served at this address. NS Railway is in unlawful possession and control of real property subject to this action.

5.

Defendant Central of Georgia Railroad Company (hereinafter "Central of Georgia") is a Georgia domestic corporation which may be served with legal process through its registered agent, J. Steven Stewart, who is located at 577 Mulberry St. 1500, Macon, Georgia 31201 and who may be served at this address. Central of Georgia acquired the assets of the Montgomery & West Point

Railroad Company as well as the Georgia Midland and Gulf Railway Company, and is a wholly-owned subsidiary of NS Railway. Central of Georgia is in unlawful possession and control of real property subject to this action.

6.

Defendant The South-Western Rail Road Company (hereinafter "Southwestern") is a Georgia domestic corporation which may be served with legal process through its registered agent, J. Steven Stewart, who is located at 577 Mulberry St. 1500, Macon, Georgia 31201 and who may be served at this address. Southwestern acquired the assets of the Muscogee Railroad Company and then was acquired by Central of Georgia. Southwestern is in unlawful possession and control of real property subject to this action.

7.

Defendant Genesee & Wyoming Railroad Services, Inc. (hereinafter "G&W Railroad") is a foreign corporation which does business in Muscogee County, Georgia and may be served with legal process through its registered agent in Georgia, CT Corporation System, which is located at 289 S Culver St., Lawrenceville, Georgia 30046-4805 and which may be served at this address. G&W Railroad is in unlawful possession and/or control of real property subject to this action. Based upon information and belief, G&W Railroad is a lessee of NS Railway and/or Central of Georgia and operates in Muscogee County, Georgia.

8.

Defendant Columbus & Chattahoochee Railroad, Inc. (hereinafter "C&C Railroad") is a foreign corporation which does business in Muscogee County, Georgia and may be served with legal process through its registered agent in Georgia, CT Corporation System, which is located at 289 S Culver St., Lawrenceville, Georgia 30046-4805 and which may be served at this address.

C&C Railroad is in unlawful possession and/or control of real property subject to this action. Based upon information and belief, C&C Railroad is a subsidiary of G&W Railroad and/or a lessee of NS Railway and/or Central of Georgia, and operates in Muscogee County, Georgia.

9.

Defendant Georgia Southwestern Railroad, Inc. (hereinafter "GA Southwestern Railroad") is a foreign corporation which does business in Muscogee County, Georgia and may be served with legal process through its registered agent in Georgia, CT Corporation System, which is located at 289 S Culver St., Lawrenceville, Georgia 30046-4805 and which may be served at this address. GA Southwestern Railroad is in unlawful possession and/or control of real property subject to this action. Based upon information and belief, GA Southwestern Railroad is a subsidiary of G&W Railroad and/or a lessee of NS Railway and/or Central of Georgia, and operates in Muscogee County, Georgia.

10.

At all times relevant to this action, Railroad has done business in Columbus, Muscogee County, Georgia by occupying real property located in Columbus, Muscogee County, Georgia which is subject to this proceeding.

**JURISDICTION & VENUE**

11.

All parties are subject to the jurisdiction of this Court.

12.

Venue is proper before this Court pursuant to G.A. CONST. art. 6, § 2, ¶ II.

## FACTUAL BACKGROUND

13.

All of the real property subject to this action is located in the historic East Commons of Columbus, Georgia.

14.

The original purpose of East Commons was to reserve land in Columbus for public use.

15.

Title to the East Commons, including all of the property subject to this action, originated in the State of Georgia. Unconveyed or reverted property in the East Commons remained titled in the State of Georgia until 1873 when it was vest in a public board serving on behalf of the State.

16.

The public board, which was known as the Commissioners of Commons of the City of Columbus, conveyed its title in the East Commons, expressly including all reversionary interests, to the City of Columbus in 1929 without any restrictions of use on the land or limitations on the title.

17.

All reversionary interests in title to land in the East Commons are now vested in CCG.

18.

In 1847, an agent for the Muscogee Railroad Company appeared before the City Council of Columbus and made "a proposition to Council in regard to obtaining a lot of ground on the East Commons for the purpose of locating a Depot for said Rail Road Company." Clerk of Council Records Book "A" for June 30, 1847 at page 168.

19.

Upon consideration of the request by the Muscogee Railroad Company, the Council resolved to allow:

> the Muscogee Rail Road Company to locate their Depot on the East Common between Randolph [12th] and Bryan [13th] Street and to occupy a space of ground for said Depot and for no other than Rail Road purposes not exceeding the breadth between the two streets and not over twelve hundred feet long leaving a street on the East and another on the West end of said Depot …. which said streets shall be as much as two hundred feet wide each … provided the title shall revert to the City whenever the Muscogee Railroad Company shall cross the River at any point above St Clair [11th] Street … provided that said Rail Road Company or their Agents are not allowed the privilege of charging storage on any produce goods wares and merchandize which may be deposited at the Depot … provided nothing herein contained shall exempt the said property from taxation by the City to be assessed when the property shall be put to use ….

Clerk of Council Records Book "A" for June 30, 1847 at pages 168-170.

20.

This resolution resulted in the Muscogee Railroad Company's depot lot having an East-to-West orientation which subsequently required alteration to a North-to-South orientation by 1849.

21.

To accommodate the Muscogee Railroad Company's plans, the Council passed a resolution indicating:

> that the Mayor and Council of the City of Columbus hereby consent that the Muscogee Rail Road Company may use and occupy four acres of land on the East Commons lying south of the Rail Road Depot and between Randolph [12th] and St Clair [11th] streets under the same terms conditions and restrictions and for the same purposes as the said Company are authorized to use the land on said Common heretofore granted by the Council for Rail Road purposes …. Provided said Company relinquish to the City of Columbus all their rights to the use of four acres of lands on said Common lying East of the said Depot.

Clerk of Council Records Book "A" for December 11, 1849 at page 414.

22.

After the Muscogee Railroad Company took possession of the property and occupied it for depot purposes, Council defined this new depot lot in 1854 by describing the lot as:

> [c]ommencing due East of the South line of Bryan Street at a point 240 feet from the East line of City lots thence running due South 1182 feet 8 inches thence running due East 600 feet thence running due north 1182 feet 8 inches thence running west 600 feet to the starting point it being the same amount of ground as was originally granted by the City Council to said Rail Road Company.

Clerk of Council Records Book "A" for June 12, 1854 at pages 321-322.

23.

Later, when the East Commons was surveyed, the Muscogee Railroad Company's depot lot was determined to occupy Commons Blocks 21, 22, 27, and 28.

24.

Muscogee Railroad Company, together with all of its real assets, consolidated into Defendant Southwestern in 1856.

25.

In 1890, Southwestern returned part of the Muscogee Railroad Company's depot lot to CCG which then reconveyed it to a third party, Golden's Foundry, who remains in possession of that part today. That part is defined as:

> Commencing at a point ninety-nine (99) feet North of the Southeast corner of block 28 and running thence North 30 feet to a point 10 feet from the center of the Westernmost track of the Southwestern Railroad thence following said track at the same distance from its center in a Northerly direction until it strikes the Western line of said parcel of land so granted to the Muscogee Railroad a distance of about 350 feet thence South along said Western line 350 feet to the South line of said parcel thence East 195 feet to the point of beginning.

Muscogee County Deed Book "DD" at pages 494-496.

26.

Today, Southwestern remains in possession of the Muscogee Railroad Company's depot lot, less and except the part conveyed to Golden's Foundry (hereinafter the "First Depot Lot").

27.

A depot was built on the First Depot Lot, but it has since been demolished and the Railroad has ceased to use the First Depot Lot for depot purposes.

28.

Through acquisition, consolidation, and merger, the Railroad crossed the Chattahoochee River above 11th Street at the site of the current bridge located between 16th and 17th Street at Railroad Street in Columbus.

29.

Upon information and belief, the Railroad charges and receives compensation for storage of goods on the First Depot Lot.

30.

Southwestern occupies the First Depot Lot subject to the same limitations and terms of reversion which the Muscogee Railroad Company voluntarily agreed to accept from Council in 1847.

31.

Upon information and belief, the Railroad's only use for the First Depot Lot is for temporary parking of empty train cars, temporary storage of train cars containing goods, and passage of through traffic which neither originates or terminates in Columbus.

32.

Pursuant to the original terms of reversion from 1847, title to the First Depot Lot reverted to CCG when the Railroad ceased to use the property for depot purposes, when the Railroad crossed the Chattahoochee River above 11th Street, and/or when the Railroad first charged for storage on the First Depot Lot.

33.

In 1859, following authorization for the Montgomery & West Point Railroad and the Muscogee Railroad to connect their tracks, an agent for the Montgomery & West Point Railroad appeared before City Council and requested land "on which to erect on the East Commons of the City, such building as may be necessary for the dispatch of freight and passenger business of the two Roads when connected." Clerk of Council Record Book "C" for August 15, 1859 at page 582.

34.

In response to the request, Council passed a resolution stating that in consideration:

of the restrictions, limitations, and grants hereafter to be mentioned and observed by the [Montgomery & West Point Railroad Company] [CCG] doth bargain, remise, release, and forever quit claim to the [Montgomery & West Point Railroad Company] and its assigns all the right, title, interest, claim or demand of the [CCG] has or may have had in an to the following described lot or parcel of land (viz) beginning due East on the South line of Bryan [13th] Street at a point (240) two hundred and forty feet from the East line of City lots, thence running due East (305 feet) three hundred and five feet, thence due North (1,000) one thousand feet, thence due West (305) three hundred and five feet thence running due South (1,000) one thousand feet to the point of beginning …. [P]rovided always that if the said [Montgomery & West Point Railroad Company] shall fail to observe the restrictions, limitations, and conditions hereafter mentioned then the right, title, and interest of the said [Montgomery & West Point Railroad Company] and those claiming under them in and to the above described premises and the improvements thereon shall be forfeited and the same shall become the property of the [CCG]. Said [Montgomery & West Point Railroad Company] hereby agrees that at no time hereafter will it make any charge or receive any compensation for the storage of any article or goods whatsoever that may be stored on said premises ….

Clerk of Council Record Book for August 22, 1859 at pages 583-584.

35.

Later, when the East Commons was surveyed, the Montgomery & West Point Railroad Company's depot lot was determined to occupy Commons Blocks 13 and 20, and up to the western line of Commons Blocks 14 and 19.

36.

Montgomery & West Point Railroad Company, together with all of its real assets, was later acquired by and consolidated into Defendant Central of Georgia.

37.

In 1890, part of the Montgomery & West Point Railroad Company's depot lot was returned to CCG which then reconveyed the lot to a third party, Swift Manufacturing Company, and a successor owner to Swift Manufacturing Company remains in possession of that part today. That part is defined as:

> Beginning at a point in commons block thirteen (13) 108 feet East from the Northeast corner of 6th Avenue on the North line of 14th Street thence North 210 feet 8 inches thence East 222 feet to the Southwestern Railroad right of way thence South 210 feet 11 inches to the North line of 14th Street thence West 204 feet 6 inches to the point of beginning.

Muscogee County Deed Book "DD" pages 492-493, 248-249.

38.

Today, Defendant Central of Georgia remains in possession of the Montgomery & West Point Railroad Company's depot lot, less and except the part conveyed to Swift Manufacturing Company (hereinafter the "Second Depot Lot").

39.

A depot was built on the Second Depot Lot, but it has since been demolished and the Railroad has ceased to use the Second Depot Lot for depot purposes.

11

40.

Upon information and belief, the Railroad charges and receives compensation for storage of goods on the Second Depot Lot.

41.

Defendant Central of Georgia occupies the Second Depot Lot subject to the same limitations and terms of reversion which the Montgomery & West Point Railroad Company voluntarily agree to accept from Council in 1859.

42.

Upon information and belief, the Railroad's only use for the Second Depot Lot is for temporary parking of empty train cars, temporary storage of train cars containing goods, and passage of through traffic which neither originates or terminates in Columbus.

43.

Pursuant to the original terms of reversion from 1859, title to the Second Depot Lot reverted to CCG when the Railroad ceased to use the property for depot purposes and/or when the Railroad first charged for storage on the Second Depot Lot.

44.

In 1869, the Mobile & Girard Railroad Company appeared before City Council to request "the privilege of locating a depot of said Road in the East Common of said city …." Clerk of Council Record Book "G" for February 1, 1869 at pages 38-39.

45.

In response to the request, Council passed a resolution stating:

> that so much of the East Common be and is hereby granted to the Mobile & Girard Railroad Company for the sole purpose of erecting thereon a depot and the necessary buildings appertaining thereto, as is situated immediately east of the present depot grounds of the South Western Railroad (formerly Muscogee),

beginning at the Northeast corner of said ground and running due East 600 feet, thence due South 1,281 feet 8 inches, thence running due West on the line of St Clair [11th] Street 600 feet, thence due North along the line of the present depot grounds of the South Western Rail Road to the starting point. The said ground to be held and used by said Rail Road Company for no other purpose than a Rail Road depot, otherwise to revert to the [CCG] with all improvements thereon. The said Company shall also be prohibited forever from charging storage on any goods received or deposited at their depot.

Clerk of Council Record Book "G" for February 1, 1869 at pages 38-39.

46.

Later, when the East Commons was surveyed, the Mobile & Girard Railroad Company's depot lot was determined to occupy Commons Blocks 23, 24, 25, and 26.

47.

The Mobile & Girard Railroad Company, together with all of its real assets, was later acquired by and consolidated into Defendant Central of Georgia.

48.

Today, Defendant Central of Georgia remains in possession of the Mobile & Girard Railroad Company's depot lot (hereinafter the "Third Depot Lot").

49.

A depot was built on the Third Depot Lot, but it has since been demolished and the Railroad has ceased to use the Third Depot Lot for depot purposes.

50.

Upon information and belief, the Railroad charges and receives compensation for storage of goods on the Third Depot Lot.

51.

Defendant Central of Georgia occupies the Third Depot Lot subject to the same limitations

and terms of reversion which the Mobile & Girard Railroad Company voluntarily agree to accept from Council in 1869.

52.

Upon information and belief, the Railroad's only use for the Third Depot Lot is for temporary parking of empty train cars, temporary storage of train cars containing goods, and passage of through traffic which neither originates or terminates in Columbus.

53.

Pursuant to the original terms of reversion from 1869, title to the Third Depot Lot reverted to CCG when the Railroad ceased to use the property for depot purposes and/or when the Railroad first charged for storage on the Third Depot Lot.

54.

The Railroad received a fee simple determinable estate in the First Depot Lot, the Second Depot Lot, and the Third Depot Lot (hereinafter collectively referred to as the "Upper Railyard").

55.

The limits of the Railroad's title to the Upper Railyard were reached when the Railroad ceased to use the Upper Railyard for the purpose which it was conveyed limited title by CCG, and title to the Upper Railyard reverted to CCG entitling it to control and possession of the Upper Railyard.

56.

In 1886, an agent for the Georgia Midland and Gulf Railway Company appeared before City Council and requested that a portion of the Commons be "set aside and reserved" for its use. Clerk of Council Record Book "I" for May 1, 1886 at page 135.

57.

In response to the request, Council requested to the Commissioners of Commons that they "set aside and reserve so much of the Commons of the City of Columbus as they may deem proper for railroad purposes" for Georgia Midland and Gulf Railway Company. Muscogee County Deed Book "Z" at page 44.

58.

The Commissioners of Commons resolved to "reserve or set aside for use of the Georgia Midland and Gulf Railroad … [Commons] Blocks Forty-five (45), Forty-six (46), Fifty one (51), Fifty-two (52) … together with the portions of the streets and avenues lying and being between said blocks …." Muscogee County Deed Book "Z" at page 44.

59.

The Commissioners of Commons imposed conditions on the reservation of land including:

> that said Railroad shall be liable to the same restrictions, limitations and requirements as were imposed by the Mayor & Council on other railroads to which grants of commons for railroad purposes have heretofore been made.

Muscogee County Deed Book "Z" at page 45.

60.

The "restrictions, limitations and requirements" referenced by the Commissioners of Commons refer to the fee simple determinable language used to convey land in the Upper Railyard.

61.

The "restrictions" appliable to the conveyance to the Georgia Midland and Gulf Railway are that the property could be used only for depot purposes.

15

62.

The "limitation[]" applicable to the conveyance to the Georgia Midland and Gulf Railway company is that the property will otherwise revert to CCG.

63.

The "requirements" include that the Georgia Midland and Gulf Railway Company was forbidden from charging for storage of goods on the property.

64.

Also, later in 1886, in consideration of the Georgia Midland and Gulf Railway Company accessing the depots in the Upper Railyard, Council requested to the Commissioners of Commons that they "set aside and grant to The Georgia Midland & Gulf Railroad Company … additional lands to be used strictly for the purposes hereinafter designated …." Clerk of Council Record Book "I" for May 6, 1886 at page 156.

65.

In response, the Commissioners of Commons resolved to:

> reserve and set aside for the use of the Georgia Midland & Gulf Rail Road Co to be used only as hereinafter designated …. So much land as may be necessary for a track over, across and through the following lands known in the plan and survey of the Commons lands as: Blocks Nos 43, 42, 40 [and] [t]he track to extend from such point on Fourth, now Tenth avenue, as the said company may indicate to the lands heretofore granted for the use of said company …. So much as may be needed for a track from the lands of said R R Co up First, now Seventh Avenue, thence across Blocks Nos 28 and 21 of the Commons lands to Union Passenger depot.

Clerk of Council Record Book "I" for May 6, 1886 at page 156-157; Muscogee County Deed Book "Z" at page 46-47.

66.

The Commissioners of Commons imposed conditions on the reservation of land including:

that said Railroad shall be liable to the same restrictions, limitations and requirements as were imposed by the Mayor & Council on other railroads to which grants of commons for railroad purposes have heretofore been made.

Muscogee County Deed Book "Z" at page 47.

67.

The "restrictions, limitations and requirements" referenced by the Commissioners of Commons refer to the fee simple determinable language used to convey land in the Upper Railyard.

68.

The "restrictions" appliable to the conveyance to the Georgia Midland and Gulf Railway are that the property could be used only for depot purposes.

69.

The "limitation[]" applicable to the conveyance to the Georgia Midland and Gulf Railway company is that the property will otherwise revert to CCG.

70.

The "requirements" include that the Georgia Midland and Gulf Railway Company was forbidden from charging for storage of goods on the property.

71.

Georgia Midland and Gulf Railway Company, together with all of its real assets, was later acquired by Defendant Central of Georgia.

72.

Today, Central of Georgia, which is a wholly-owned subsidiary of NS Railway, remains in possession of the Georgia Midland and Gulf Railway depot properties including, but not limited to, all or parts of Commons Blocks numbered 40, 42, 43, 45, 46, 51, and 52 together with the

portions of the streets and avenues lying and being between said blocks, partial blocks, and Tenth Avenue (hereinafter the "Lower Railyard").

73.

A depot does not exist in the Lower Railyard, and it can no longer be used to access a depot in the Upper Railyard because a depot does not exist there.

74.

Upon information and belief, the Railroad charges for and receives compensation for storage of goods in the Lower Railyard.

75.

Railroad occupies the Lower Railyard subject to the same terms of reversion which the Georgia Midland and Gulf Railway Company accepted from the Council and Commissioners in 1886.

76.

Upon information and belief, many of the tracks in the Lower Railyard are not active and the tracks which are active are only used for temporary parking of empty train cars, temporary storage of train cars containing goods, and primarily for passage of through traffic which neither originates or terminates in Columbus.

77.

Pursuant to the original terms of reversion from 1886, title to the Lower Railyard reverted to CCG when the Railroad ceased to use the property for depot purposes and/or when the Railroad first charged for storage on the Lower Railyard.

78.

The Railroad received a fee simple determinable estate in the Lower Railyard.

79.

The limits of the Railroad's title to the Lower Railyard were reached when the Railroad ceased to use the Lower Railyard for the purpose which it was conveyed limited title by CCG, and title to the Lower Railyard reverted to CCG entitling it to control and possession of the Lower Railyard.

80.

CCG issued a demand for possession of the Upper Railyard and the Lower Railyard to the Railroad. A copy of CCG's demand is attached here as Exhibit "A" and is incorporated herein by this reference.

81.

Railroad received the Demand and refused to deliver possession of either the Upper Railyard or the Lower Railyard to CCG. A copy of the Railroad's response to CCG's demand is attached here as Exhibit "B" and is incorporated herein by this reference.

82.

Railroad further refused to cooperate with CCG in a manner which would have prevented CCG's need to file this action by refusing to meet with CCG to resolve these issues and negotiate a mutually beneficial arrangement between the parties.

83.

By refusing to deliver possession to CCG, the Railroad is preventing CCG's full use and enjoyment of both the Upper Railyard and the Lower Railyard.

84.

Railroad gained possession of the Upper Railyard and the Lower Railyard pursuant to Railroad's voluntary agreement to accept the property pursuant to resolutions by City Council.

85.

CCG Council rescinded the prior resolutions granting limited title and possession of the Upper Railyard and the Lower Railyard to the Railroad on May 23, 2023. A copy of CCG Council Resolution Number 171-23 is attached here as Exhibit "C" and incorporated herein by this reference.

86.

Railroad is aware of Resolution Number 171-23 and continued its refusal to transfer possession of the Upper Railyard and the Lower Railyard to CCG. A copy of Railroad's response to the resolution is attached here as Exhibit "D" and is incorporated herein by this reference.

87.

Railroad's unlawful use and possession of the Upper Railyard and the Lower Railyard will continue in perpetuity requiring multiple legal actions to be filed by CCG for it to recover its losses from Railroad.

## **COUNT 1**
**(Trespass – O.C.G.A. § 51-9-1 *et. seq.*)**

88.

CCG incorporates and realleges here paragraphs 1 through 87 above.

89.

Title to the Upper Railyard is vested in CCG, and the Railroad remains in possession of the Upper Railyard against CCG's interests and demands.

90.

Railroad's possession of the Upper Railyard constitutes a continuing trespass against CCG under O.C.G.A. § 51-9-1 *et. seq.*

91.

CCG is entitled to recover possession of the Upper Railyard from Railroad under O.C.G.A. § 51-9-1 *et. seq.*

92.

Railroad's possession of the Upper Railyard has damaged CCG and CCG is entitled to recover from Railroad for that damage in an amount to be proven by the evidence to be presented at the trial of this action.

## COUNT 2
### (Trespass – O.C.G.A. § 51-9-1 *et. seq.*)

93.

CCG incorporates and realleges here paragraphs 1 through 87 above.

94.

Title to the Lower Railyard is vested in CCG, and the Railroad remains in possession of the Lower Railyard against CCG's interests and demands.

95.

Railroad's possession of the Lower Railyard constitutes a continuing trespass against CCG under O.C.G.A. § 51-9-1 *et. seq*.

96.

CCG is entitled to recover possession of the Lower Railyard from Railroad under O.C.G.A. § 51-9-1 *et. seq*.

97.

Railroad's possession of the Lower Railyard has damaged CCG and CCG is entitled to recover from Railroad for that damage in an amount to be proven by the evidence to be presented at the trial of this action.

**COUNT 3**
**(Injunction – O.C.G.A. § 9-5-1)**

98.

CCG incorporates and realleges here paragraphs 1 through 87 above.

99.

Railroad's possession of the Upper Railyard and the Lower Railyard constitutes a continuing trespass under O.C.G.A. § 51-9-6 which will require a multiplicity of actions by CCG to recover for its losses caused by Railroad.

100.

In order to prevent multiple legal actions, CCG is entitled to equitable relief in the form of a permanent injunction against the Railroad from continuing its trespass on CCG's property in both the Upper Railyard and the Lower Railyard pursuant to O.C.G.A. § 9-5-1.

**COUNT 4**
**(Ejectment – First Depot Lot)**

101.

CCG incorporates and realleges here paragraphs 1 through 87 above.

102.

The legal description for the First Depot Lot is:

Commencing due East on the South line of [13th] Street at a point 240 feet from the East line of City lots [in the city block across 6th Avenue from commons block 21][which point is 108 feet East of the Southeast corner of the intersection of 6th Avenue and 13th Street] thence running due South 1,182 feet 8 inches thence running due East 600 feet thence running due North 1,182 feet 8 inches thence running West 600 feet to the starting point. LESS AND EXCEPT: commencing at a point ninety-nine (99) feet North of the Southeast corner of block 28 and running thence North 30 feet to a point 10 feet from the center of the Westernmost track of the Southwestern Railroad thence following said track at the same distance from its center in a Northerly direction until it strikes the Western line of said parcel of land so granted to the Muscogee Railroad a distance of about 350 feet thence South

along said Western line 350 feet to the South line of said parcel thence East 195
feet to the point of beginning.

*See* Clerk of Council Record Book "B" June 12, 1854, pages 321-322; *see also* Muscogee County

Deed Book "NN" pages 150-152; *see also* Muscogee County Deed Book "DD" pages 494-495.

103.

Railroad's title to the First Depot Lot reverted to CCG and CCG is entitled to a writ of

possession against the Railroad for the First Depot Lot pursuant to O.C.G.A. § 44-11-1 *et. seq.*

<u>**COUNT 5**</u>
**(Ejectment – Second Depot Lot)**

104.

CCG incorporates and realleges here paragraphs 1 through 87 above.

105.

The legal description of the Second Depot lot is:

Beginning due East on the South line of [13th] Street at a point 240
feet from the East line of City lots [in the city block across 6th
Avenue from commons blocks 21 and 20][which point is 108 feet
East of the Southeast corner of the intersection of 6th Avenue and
13th Street], thence running due East 305 feet thence due North
1,000 feet thence due West 305 feet thence South 1,000 feet to the
point of beginning. LESS AND EXCEPT: Beginning at a point in
commons block thirteen (13) 108 feet East from the Northeast
corner of 6th Avenue on the North line of 14th Street thence North
210 feet 8 inches thence East 222 feet to the Southwestern Railroad
right of way thence South 210 feet 11 inches to the North line of 14th
Street thence West 204 feet 6 inches to the point of beginning.

*See* City Council Record Book "C" August 15, 1859, pages 582-584; *see also* Muscogee County

Deed Book "DD" pages 492-493, 248-249.

106.

Railroad's title to the Second Depot Lot reverted to CCG and CCG is entitled to a writ of

possession against the Railroad for the Second Depot Lot pursuant to O.C.G.A. § 44-11-1 *et. seq.*

### COUNT 6
### (Ejectment – Third Depot Lot)

107.

CCG incorporates and realleges here paragraphs 1 through 60 above.

108.

The legal description to the Third Depot Lot is:

situated immediately East of the present depot grounds of the South Western Rail Road (formerly Muscogee) beginning at the Northeast corner of said ground [which point is 708 feet East of the Southeast corner of the intersection of 6th Avenue and 13th Street] and running due East 600 feet, thence due South 1,281 feet 8 inches, thence running due West on the line of [11th] Street 600 feet, thence due North along the line of the present depot grounds of the South Western Rail Road to the starting point.

*See* Clerk of Council Record Book "G" for February 1, 1869 at pages 38-39; *see also* Muscogee

County Deed Book 23, pages 337-339.

109.

Railroad's title to the Third Depot Lot reverted to CCG and CCG is entitled to a writ of

possession against the Railroad for the Third Depot Lot pursuant to O.C.G.A. § 44-11-1 *et. seq.*

### COUNT 7
### (Ejectment – The Lower Railyard)

110.

CCG incorporates and realleges here paragraphs 1 through 87 above.

111.

The legal description for the Lower Railyard is: all or parts of Commons Blocks numbered 40, 42, 43, 45, 46, 51, and 52 together with the portions of the streets and avenues lying and being between said blocks, partial blocks, and Tenth Avenue. Muscogee County Deed Book "Z" at pages 44-47.

112.

Railroad's title to the Lower Railyard reverted to CCG and CCG is entitled to a writ of possession against the Railroad for the Lower Railyard pursuant to O.C.G.A. § 44-11-1 *et. seq*.

## COUNT 8
### (Mesne Profits – O.C.G.A. § 44-11-7)

113.

CCG incorporates and realleges here paragraphs 1 through 87 above.

114.

While the Railroad remains in possession of the Upper Railyard and the Lower Railyard, the Railroad is receiving the benefits of possession and control of the Upper Railyard and the Lower Railyard and preventing those benefits from accruing to CCG.

115.

The monetary value of the Railroad's benefit from use and control of the Upper Railyard and the Lower Railyard will be proven by evidence at the trial of this action, and CCG is entitled to recover that monetary value from the Railroad, together with possession of the Upper Railyard and the Lower Railyard, as mesne profits pursuant to O.C.G.A. § 44-11-7.

## COUNT 9
### (Nuisance – O.C.G.A. § 41-1-1 *et. seq.*)

116.

CCG incorporates and realleges here paragraphs 1 through 87 above.

117.

Railroad damaged to the Upper Railyard and the Lower Railyard which depreciates the monetary value and usefulness of the Upper Railyard and the Lower Railyard.

118.

The damage to the Upper Railyard and the Lower Railyard constitutes a nuisance under O.C.G.A. § 41-1-1 et. seq.

119.

CCG is entitled to recover from Railroad for the nuisance it created in an amount to be proven by the evidence to be presented at the trial of this action.

## COUNT 10
### (Abatement of Nuisance - O.C.G.A. § 41-2-1 *et. seq.*)

120.

CCG incorporates and realleges here paragraphs 1 through 87 above.

121.

Railroad's damage to the Upper Railyard and Lower Railyard constitutes a nuisance which manifestly injures the public health and safety of Columbus, Georgia.

122.

CCG is entitled to an order from this Court requiring Railroad to abate the nuisance(s) existing in the Upper Railyard and the Lower Railyard pursuant to O.C.G.A. § 41-2-1.

## COUNT 11
**(Attorney's Fees)**

123.

CCG incorporates and realleges here paragraphs 1 through 87 above.

124.

Railroad has acted in bad faith by remaining on CCG's property, been stubbornly litigious by refusing to meet with CCG to discuss the issues underlying this action, and caused CCG unnecessary trouble and expense by leaving CCG with no alternative but to seek recovery of the property through this action.

125.

CCG is entitled to recover from Railroad its litigation expenses, including costs and attorney's fees, arising from this action under Georgia law and pursuant to O.C.G.A. §§ 13-6-11 and 44-11-14.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CCG prays for the following relief:

(1)      That summons and process be issued to the Defendant Railroad to this action;

(2)      That judgment be entered against Defendant Railroad in favor of Plaintiff on each count in this Complaint;

(3)      That judgment in favor of Plaintiff and against Defendant Railroad include the full amount proven at the trial of this action;

(4)      For a trial by jury;

(5)      That the costs and fees associated with this action be taxed against Defendant Railroad in favor of Plaintiff; and

(6)    That the Court grant such other and further relief as it deems just and proper under the circumstances.

Respectfully submitted this 28th day of August, 2025.

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By: */s/ Jack P. Schley*
      James C. Clark, Jr.
      Ga. Bar No. 127145
      Thomas F. Gristina
      Ga. Bar No. 452454
      Jack P. Schley
      Ga. Bar No. 891829

1111 Bay Avenue, Third Floor    (Office)
P.O. Box 1199    (Mailing)
Columbus, Georgia 31902
(706) 324-0251
jclark@pagescrantom.com
tgristina@pagescrantom.com
jschley@pagescrantom.com

By: */s/ Clifton C. Fay*
      Clifton C. Fay
      Ga. Bar No. 256460
      Lucy T. Sheftall
      Ga. Bar No. 639813

P.O. Box 1340
Columbus, Georgia 31902
cfay@columbusga.org
lsheftall@columbusga.org

*Counsel for Plaintiff Consolidated Government of Columbus, Georgia*

# EXHIBIT A

*[CCG's Demand for Possession of Railyards]*

 **PageScrantom**

Page, Scrantom, Sprouse, Tucker & Ford, P.C.

**JACK P. SCHLEY**
DIRECT: (706) 243-5614
FAX: (706) 243-0417
EMAIL: jschley@pagescrantom.com

April 12, 2023

**Via U.S. Certified and Regular Mail & Email**
Norfolk Southern Corp.
Attn: Nabanita Nag
650 West Peachtree Street NW
Atlanta, Georgia 30308
nabanita.nag@nscorp.com

**Via U.S. Certified and Regular Mail & Email**
Norfolk Southern Corp.
Attn: Andrew Vollmer
650 West Peachtree Street NW
Atlanta, Georgia 30308
andrew.vollmer@nscorp.com

**Via U.S. Certified and Regular Mail & Email**
Norfolk Southern Corp.
Attn: J. Steven Stewart
577 Mulberry St. 1500
Macon, Georgia 31201
stevestewart@hbgm.com

   *Re:*  **_Reversion of Title to the Norfolk Southern Railyards in Columbus, Georgia & the Spiderweb Project on Buena Vista Road_**

To Counsel and Real Estate Management for Norfolk Southern:

  This firm represents the Consolidated Government of Columbus, Georgia (hereinafter "CCG") in regards to two claims against Norfolk Southern. The first claim pertains to Norfolk Southern's occupation of two large tracts of land in downtown Columbus, Georgia (the "Railyards"). The second claim is in regards to the spiderweb overpass project on Buena Vista Road in Columbus. These claims are summarized below and detailed further in the memorandum enclosed with this letter.

  The Railyards were created between 1847 and 1886 by resolution of the CCG for use by the railroads "solely for depot purposes." It is under these original resolution terms which Norfolk Southern now occupies the Railyards. Norfolk Southern does not use the Railyards for depot purposes; therefore, pursuant to the original terms of conveyance, title to the Railyards has reverted to CCG, which hereby demands possession of the land from Norfolk Southern, payment of back-rent, and continuous payment of rent until Norfolk Southern vacates the Railyards. *See* enclosure.

  The spiderweb project is a multimillion-dollar project to relieve traffic congestion on Buena Vista Road which is caused by the crossing of Norfolk Southern's trains on that road. CCG demands Norfolk Southern's full cooperation, pursuant to Georgia law, to see the project is completed. CCG has complied with all procedural requirements pursuant to O.C.G.A. § 32-6-194, and the costs of the project must be shared according to an agreement between CCG and Norfolk Southern pursuant to O.C.G.A. § 32-6-195.

Railyards in Columbus, GA
Page 2
April 12, 2023

We would like to schedule a meeting between CCG, Norfolk Southern, and counsel for both parties to take place in Columbus, Georgia on Monday, May 1, 2023 beginning at 10:00 AM in the conference room of our firm located in the Synovus Centre at 1111 Bay Ave, Third Floor, Columbus, Georgia 31901. The purpose of this meeting will be to discuss the details of these claims. To help Norfolk Southern prepare for the meeting, we enclose with this letter a memorandum of our legal research into this matter. We request that, prior to April 20, 2023, Norfolk Southern produce to the undersigned information regarding Norfolk Southern's current use of the Railyards, including, the quantity of traffic through the Railyards, the origins and destinations of the traffic, the role of the Railyards for facilitating that traffic, and whether Norfolk Southern charges and/or receives payment for storage in the Railyards. Also, please produce any documents supporting Norfolk Southern's claim of title to the Railyards, if any.

Your written response to this letter with a specific response to the proposed meeting date of May 1 in Columbus would be appreciated. Please issue such a response to the undersigned by April 24, 2023.

We look forward to your prompt attention to this matter.

Sincerely,

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By:

Jack P. Schley

JPS/ljw
   (Enclosures)
cc: Jim Clark
    Thomas Gristina
    Clifton Fay, City Attorney
    Skip Henderson, Mayor
    Isaiah Hugley, City Manager

## MEMORANDUM

| | |
|---|---|
| **TO:** | **Norfolk Southern Corporation** |
| **FROM:** | **The Consolidated Government of Columbus, Georgia** |
| **DATE:** | **April 12, 2023** |
| **RE:** | **Reversion of Title to Railyards in Columbus, Georgia** |

### A. SUMMARY

The Consolidated Government of Columbus, Georgia ("CCG") owns more than sixty-seven (67) acres of real estate in downtown Columbus, Georgia which is currently occupied and controlled by Norfolk Southern Railway Company/Norfolk Southern Corporation and used as its railyards. Norfolk Southern does not pay rent for its use of this property, and it appears to pay a negligible amount in property taxes annually. This acreage consists of two separate tracts of land. The first tract contains about thirty-seven (37) acres of land intended for "depot purposes" and a deed for this acreage into the railroad does not exist. The second tract consists of about thirty (30) acres of land subject to the limitations and conditions which govern the first tract. This report details CCG's right to have both railyards returned to its control and/or to collect money owed to CCG from Norfolk Southern.

When Columbus was created and planned by the General Assembly of the State of Georgia, the original city was surrounded by public land to the North, East, and South, with the Chattahoochee River to the West. After the original surveys were completed, this public land was designated as the Columbus Commons and was intended for public use. The East Commons begins East of 6th Avenue running North to meet the North Commons at the City Cemetery (Historic Linwood Cemetery) and South to the South Commons below Victory Drive.

In the 1840s, City leaders determined that the best use of the Commons was to grant certain parcels of land to the railroad companies, to be used exclusively for railroad purposes. By granting

public land for this purpose, the railroads would assist with the economic growth and development of Columbus, Georgia. City leaders were mindful, however, to protect the public nature of the Commons and conveyed the land subject to specific terms, including reversion, if the railroads attempted to use the land for other than railroad purposes. Commons parcels were granted in this manner to the railroads for placing their tracks around and through Columbus. Specific parcels were also granted separately for the **sole** purpose of the railroad operating a passenger Depot on those parcels. Of these Depot parcels, four became the locations of historic train depots in the East Commons of Columbus.

Over the near century-and-a-half that train Depots operated on these Depot parcels, excess land on the parcels was transferred to other entities; such as, Swift Manufacturing Company and Golden's Foundry. The deeds of these transactions document the reversion interest of CCG to these tracts of land within the East Commons, as all of these tracts were deeded from the railroad to the government of Columbus, first, and then from Columbus to the new entity. Considering these reversion events, there remains of the original Depot parcels in the East Commons about thirty-seven (37) acres[1] of land subject to terms of reversion. This land constitutes a significant part of the railyard[2] in downtown Columbus, Georgia, over which the 13th Street viaduct passes.

The local railroads terminated all passenger services by the 1970s, and the railroad's need for a passenger Depot ceased at that time. As a consequence of this, the original, expressed purpose for which the four Depot parcels in the East Commons were granted to the railroads became impossible to achieve. However, title to only one of the four Depot parcels has been recognized as

---

[1] An informal survey based on the property descriptions of these parcels suggests thirty-seven (37) acres, more or less, were granted to the railroads for "Depot purposes."

[2] "Railyard" refers to the area used by the railroad East of 6th Avenue, West of 10th Avenue, North of 11th Street, and South of 15th Street in downtown Columbus, Georgia. The second railyard is East of 6th Avenue, West of 10th Avenue, North of Porterdale Cemetery, and South of 8th Street in downtown Columbus, Georgia. This second railyard is addressed separately below.

having returned to CCG, and the other three remain in the use of the railroad to this day for other than Depot purposes.

CCG may take legal action to have its reversionary interest in these three Depot parcels recognized and enforced; thereby, returning over thirty-seven acres of land in the heart of historic downtown to CCG's control. Such legal action is supported by the resolutions creating the parcels, as well as, Georgia law and legal precedent. There is also support for enforcing the payment of rent against the railroad.

## B. HISTORY

### I.    Creation and Governance of the Columbus Commons by the State Legislature

For a complete understanding of the railyard, an examination of its legislative history is necessary as Columbus, Georgia, the various railroad companies, and the East Commons are all creatures of statute having been created through acts of the Georgia General Assembly.

A trading town to "be called and known by the name of Columbus" was created by the Georgia General Assembly in 1827. The State's plan for Columbus required that a tract of twelve hundred (1,200) acres was to be surveyed at the Falls of the Chattahoochee River, and this tract was to be reserved for the "town of Columbus" and its "commons." Within this tract, a grid of city blocks and streets fronted the River and the Commons encircled the grid on its North, South, and East borders. The city blocks within the grid were sold at auction; however, the Commons were retained for public purposes and remained as land of the State of Georgia. [Ga. Laws 1827, pages 183-184].

A year later the Intendant and Commissioners of the incorporated Town of Columbus were empowered to lease the Commons "for any term not exceeding three years." Any further action concerning the Commons required approval by the State. [Ga. Laws 1828, pages 153-154]. This

arrangement continued even after the City of Columbus was incorporated in 1836. [Ga. Laws 1835, pages 55-61].

Following three decades of the State's direct involvement in any significant activity occurring in the East Commons of Columbus, the General Assembly acted to simplify the State's role relating to the use of the public land in Columbus. Title to the Commons was vested by the State in a Board of Commissioners[3] which was empowered to survey, sell, lease, and reserve land in the Columbus Commons for specific purposes. [Ga. Laws 1873, pages 127-128]. This authorization was later amended to specifically include the power to grant land for "railroad purposes." However, this specific power was conditioned upon railroad lands remaining subject to taxation once granted to and entered upon by the railroad companies. [Ga. Laws 1882, page 269]. The General Assembly implied through statute that the Commissioners of Commons were to coordinate and cooperate with the Mayor and City Council of Columbus to determine how the Commons parcels were to be granted and used by the railroad companies. [Ga. Laws 1886 Vol. 2, page 613].

Through cooperation between the Commissioners of Commons, the Mayor and City Council, and the Georgia General Assembly, land in the East Commons was conveyed, recovered, and reconveyed to various entities, including multiple railroad companies, for over half a century. Then in 1929 the Commissioners of Commons of the City of Columbus was abolished by an act of the Georgia General Assembly. Within this same act, the State of Georgia vested all title to remaining (unconveyed) land in the Columbus Commons, including "**all reversionary interests in any of said commons land heretofore disposed of**," in the City of Columbus. This title in CCG was made "without any restrictions upon the use of said lands," but expressly required that

---

[3] The Board was later renamed by the General Assembly to be known as the "Commissioners of Commons of the City of Columbus." [Ga. Laws 1901, pages 358-359].

lands reserved for "railroad purposes" remain subject to taxation. All funds, rents payable, and sales proceeds previously owed to or possessed by the Commissioners of Commons were required to be paid to the City of Columbus. [Ga. Laws 1929 Vol. 1, pages 975-977].

As revealed by these statutes, the East Commons was created and owned by the State of Georgia, and State authority—together with local influence from city leaders in Columbus—remained over the East Commons into the twentieth century. Under Georgia law at the present time, however, all title and authority over the Commons—including future title gained through the triggering of terms of reversion—is vested in CCG.

## II.    Authorization and Recognition of the Railroads in Columbus

### a.    *The Muscogee Railroad Company*

While it was not the first attempt to establish a railroad in and through Columbus, Georgia, the Muscogee Railroad Company was the first of relevance to this report. The Muscogee Railroad Company[4] was incorporated by an act of the Georgia General Assembly in 1845. [Ga. Laws 1845, pages 116-118]. Over the course of the proceeding decade, the Muscogee Railroad Company located its Depot in the East Commons of Columbus.

The first attempt to create a Depot was in 1847 when the Company approached the Mayor and City Council of Columbus requesting land "for the purpose of locating a Depot" in the East Commons. Land in the East Commons was granted to the Muscogee Railroad that year by the Mayor and City Council, and the General Assembly later ratified the conveyance as a "fee simple" transfer of the Commons parcel. [Ga. Laws 1847, pages 166-167]. This 1847 parcel was granted for the purpose of locating a Depot "and for no other than Rail Road purposes." The Depot parcel was located between 11th and 12th Streets and ran East from 6th Avenue a total of twelve hundred

---

[4] The Muscogee Railroad Company, together with all of its real assets, was consolidated into the Southwestern Railroad Company in 1856. [Ga. Laws 1855, pages 187-188].

(1,200) feet, all within the East Commons. Other terms of the conveyance included an expressed term of reversion of title to the city if the Muscogee Railroad crossed the Chattahoochee River above 11th Street, as well as, a prohibition against the railroad charging for storage of goods at the Depot, and a condition that the parcel was subject to taxation by the city. [Clerk of Council Record Book "A" June 30, 1847, pages 168-170].

The route of the Muscogee Railroad line changed by 1849 and the Company requested that the city accept an exchange of a portion of the East end of the Depot parcel for land to the South of the parcel, effectively changing the orientation of the Depot parcel from East-to-West to North-to-South. To accommodate the railroad, this proposal was accepted by the Mayor and City Council and was ratified by the General Assembly as a "fee simple" conveyance "for the purpose of a Railroad depot." [Clerk of Council Record Book "A" December 11, 1849, page 414][Ga. Laws 1849, pages 237-238].

The specifications of the 1849 alterations to the Muscogee Railroad Company Depot parcel were clarified by the Mayor and City Council in 1854. In that year, the city provided a metes-and-bounds description of the altered Depot parcel, and described it as running from East-to-West for six hundred (600) feet, and North-to-South for one thousand one hundred eighty two feet and eight inches (1,182 ft. 8 in.). This resolution effectively clarified the parcel description, and left the 1847 terms and restrictions of the conveyance in place. [Clerk of Council Record Book "B" June 12, 1854, pages 321-322].

This 1854 Muscogee Railroad Depot parcel remains intact, more or less, in the East Commons, and constitutes the first Depot parcel of interest in this report.

**b.**    *The Montgomery & West Point Railroad Company*

The second Depot parcel created and remaining in the East Commons was originally conveyed to the Montgomery and West Point Railroad Company.[5] This railroad company originated in Alabama, and was incorporated under Georgia law as the Montgomery and West Point Railroad Company in 1854. The State of Georgia expressly authorized this company to cross the Chattahoochee River into Georgia and to locate a Depot in Georgia, but conditioned this authorization as follows: "Said Rail Road Company shall not cross said river except at the places designated by the Mayor and City Council of Columbus; and shall not build their Depot at any other place, except at such place as said Mayor and City Council may designate and agree upon with said Rail Road Company, and upon such terms as may be agreed upon between the parties." [Ga. Laws 1853, pages 446-447]. This statute reflects that the General Assembly empowered the government of Columbus, Georgia to speak to the matter of the Montgomery and West Point Railroad's Depot parcel. The minutes of the City Council of Columbus reveal the Mayor and Council did, in fact, act on this authority granted by the State.

It was first determined that a "depot lot" to be used "for the purpose of a Rail Road Depot" and other parcels for railroad tracks were to be located in the North Commons near where the Montgomery and West Point Railroad's bridge was to be built across the Chattahoochee River. This conveyance was conditioned upon a prohibition that the Montgomery and West Point Railroad would not connect its track with those of the other railroad companies operating in

---

[5] The Montgomery and West Point Railroad Company was consolidated into the Western Railroad of Alabama in the 1870s. The Western Railroad of Alabama occupied the 1859 Depot parcel, and it was later conveyed to the Central Railroad and Banking Company of Georgia. [Muscogee County Deed Books "R" pages 72-74, "S" pages 330-331, and "W" pages 521-523.

Columbus, otherwise the North Commons parcel would "revert to the City of Columbus." [Clerk of Council Record Book "B" August 2 and August 26, 1853, pages 193-200].[6]

The initial location of a bridge and "depot lot" in the North Commons was accomplished; however, the Georgia General Assembly authorized the various railroad companies in Columbus to connect their tracks "through the city commons and streets of Columbus . . . as may be necessary for the convenience of freights and passengers" in 1857. This authorization created a need for the Montgomery and West Point Railroad to relocate its Depot. [Ga. Laws 1857, page 73].

The final location of the Montgomery and West Point Railroad's "depot lot" was created in 1859. That year, the parcel in the North Commons was exchanged for "land . . . on which to erect . . . such building as may be necessary for the dispatch of freight and passenger business" in the East Commons. The stated purpose of this exchange was for the Montgomery and West Point Railroad "to erect a through freight house to be used by the Montgomery & West Point and Muscogee Rail Road Companies and for the erection of a ware house for the local business of the Montgomery & West Point Rail Road and to lay down a track to a general passenger house hereafter to be constructed in front of the present Depot of the Muscogee Rail Road." Upon a petition by the railroad for land for such a purpose, the Mayor and City Council of Columbus conveyed to the Montgomery and West Point Railroad a Depot ground immediately North of the Muscogee Railroad's Depot in the East Commons. These two Depot grounds share a common corner and border along the South line of 13th Street. The Montgomery and West Point Depot ground runs North across 13th Street and through 14th Street. The terms of this conveyance included a reversionary clause should the railroad company fail to comply with all the terms of the conveyance; including, the Company could not charge for storage on the parcel, it could not

---

[6] The North Commons "depot lot" was further conditioned upon a prohibition of the railroad charging for storage at the depot, and of the parcel remaining subject to taxation.

operate a hotel, tavern, or saloon servicing Depot passengers on the parcel, all improvements could be only for legitimate "railroad business," and the Company was required to pay taxes on the parcel. [Clerk of Council Record Book "C" August 15, 1859, pages 582-584].

Except for a portion on the North end of this Depot parcel, which was returned to the city and conveyed to Swift Manufacturing Company, this 1859 Montgomery and West Point Depot parcel remains in place in the East Commons, and constitutes the second Depot parcel of interest in this report.

    c.    ***The Mobile & Girard Railroad Company***

The third and final Depot parcel of interest in this report is that of the Mobile and Girard Railroad Company which was conveyed by the Mayor and City Council of Columbus in 1869. This is the first and only parcel of the three Depot parcels which was is reflected in the real estate records of Muscogee County.

In 1869, the Mayor and City Council of Columbus by resolution "granted to the Mobile and Girard Rail Road Company for the sole purpose of erecting thereon a Depot" a sixteen (16) acre tract[7] in the East Commons "immediately East of the present depot ground of the South Western Rail Road (formerly Muscogee) . . . for no other purpose than a Rail Road depot; otherwise to revert to the Mayor and Council of Columbus, Georgia with all improvements thereon." The deed describing the metes-and-bounds of this parcel also included the familiar terms of a prohibition against the railroad charging for storage on the parcel, and the parcel remaining subject to taxation by the city. The Mayor and Council also authorized the Mobile and Girard Railroad to connect its lines with those of the Muscogee Railroad and the Montgomery and West

---

[7] Muscogee County Deed Book 23, pages 337-339.

9

Point Railroad. [Clerk of Council Record Book "G" February 1, 1869, pages 38-39][Muscogee County Deed Book "S" page 379].

This 1869 parcel remains intact, more or less, in the East Commons, immediately East of and adjoining the Muscogee Railroad Depot parcel, and is occupied by the active rail lines of the railyard.

**d.    *The Historic Union Passenger Station at 1200 6th Avenue***

The history of the former Union Passenger Station parcel along 6th Avenue is of significant relevance to this report, even if it is not of interest to the proposal detailed herein.

The historic Depot structure at 1200 6th Avenue, formerly occupied by the Greater Columbus Chamber of Commerce, was built in 1901 on a parcel of land in the East Commons created that same year. This parcel was also recorded in a deed and in a later survey.[8] The parcel was granted by the Commissioners of Commons of the City of Columbus to the Central of Georgia Railway Company. The language of the deed indicates this parcel was "vacant land" in commons block twenty-one (21) "lying immediately West of the present passenger station of the [Central of Georgia Railway Company]." The parcel was further described as having a starting point at the Northeast corner of the intersection of 12th Street and 6th Avenue and running East along 12th Street a distance of one hundred and eight (108) feet to the Western boundary of the Muscogee Railroad Depot parcel, which at that time contained the passenger Depot of the Central of Georgia Railway Company.

This 1901 parcel was granted for the purpose of improving and enlarging the then-existing passenger station on the Muscogee Railroad Depot parcel "for the convenience and use of the people of the City of Columbus and the general public" and was to be used "for no other purpose"

---

[8] Muscogee County Deed Book "NN" pages 150-152; Muscogee County Plat Books 90, Folio 7; and, 106, Folio 6.

than as the "Union Passenger Station." The deed also included a reversionary clause stating that upon the railroad's failure to comply with the terms of the conveyance "the title to said land herein conveyed is to revert to [the Commissioners of Commons], their successors and assigns, and the purchase price paid therefore shall be forfeited." This conveyance did not include the traditional conditions associated with the other Depot parcels; specifically, a prohibition of charging for storage and the parcel remaining subject to taxation. Thus, the primary condition of the parcel preventing reversion was the use of the parcel for operating the passenger station "and for no other purpose." [Muscogee County Deed Book "NN" pages 150-152].

These terms of reversion governing the 1901 Depot parcel became of concern to both the City of Columbus and the Central of Georgia Railway Company forty (40) years after the creation of the parcel. In 1941, the railroad desired to operate a restaurant within the Union Passenger Station, as a service to the passengers using the Depot. The concern was that a restaurant was not a Depot purpose, and that such an operation on the 1901 Depot parcel would trigger the reversion clause. To resolve the matter, the City Council resolved that a restaurant within the Union Passenger Station "would be in aid of rather than in conflict with the general purpose" stated in the 1901 deed, and the city consented in a recorded deed to the operation of the restaurant within the Union Passenger Station to prevent the triggering of the reversion clause. [Muscogee County Deed Book 179, pages 46-47]. With this understanding, the Union Passenger Station continued to operate for Depot purposes.

After the termination of passenger services at the Union Passenger Station around 1970, the Central of Georgia Railroad Company conveyed the 1901 Depot parcel to the CCG by a quit claim deed in 1984. [Muscogee County Deed Book 2370, pages 163-164]. In an effort to save the historic Depot structure on the parcel, the CCG entered into an agreement with Total Systems

11

Services in which the CCG conveyed title to the parcel by warranty deed to Total Systems and Total Systems renovated and restored the Union Passenger Station structure. This conveyance was made without terms of reversion. [Muscogee County Deed Book 2958, pages 286-288]. Total Systems subsequentially sold the property to a private third party, and title to the property currently remains in a private entity that leases the former Union Passenger Station structure. [Muscogee County Deed Books: 5420, page 223; 5970, page 326; and 11772, page 269].

The chain of title to this 1901 Depot parcel exemplifies the potential title for the three Depot parcels of interest in this report. All four of the Depot parcels in the East Commons were subject to similar purposes and terms of reversion. Reversionary events have occurred on all four parcels triggering the terms of reversion included in the language creating each parcel. To date, only one of the four parcels (the 1901 Depot) has been recognized as having reverted to CCG.

e.    *Norfolk Southern Railway and the Central Railroad & Banking Co. of GA*

By 1882, the Depot parcels in the East Commons for the Muscogee Railroad, the Montgomery and West Point Railroad, and the Mobile and Girard Railroad were all conveyed to the Central Railroad & Banking Company of Georgia. [Muscogee County Deed Books "R" pages 72-74; "V" pages 442-446; "W" pages 521-523; and 23, pages 337-339]. The Central Railroad & Banking Company of Georgia was consolidated into Norfolk Southern Railway, a subsidiary of Norfolk Southern Corporation. Therefore, Norfolk Southern is the current occupant of the railyard and the three Depot parcels, as the successor in interest to the original railroads which were granted the land in the East Commons.

## C. **PROPERTY**

Each of the three Depot parcels has a metes-and-bounds property description that allows each parcel to be surveyed and mapped against the adjoining parcels in the East Commons. An informal survey has been performed and is attached here as Exhibit "A" to this report.

Over the years of use of the Depot parcels by the railroad, certain marginal portions of each parcel remained unused or became vacant. As the Mayor and Council of Columbus and the Commissioners of Commons continued in their duties to find uses for the East Commons that would benefit the public, these vacant areas of the Depot parcels were viewed as options for further development of the East Commons by non-railroad entities. Mills, churches, city parks, and community welfare groups were among the non-railroad entities that have been located in the East Commons around the Depot parcels. Negotiations with these entities between the Mayor and City Council and the railroads occasionally resulted in the return of a part of one of the Depot parcels by the railroad to Columbus for subsequent conveyance by Columbus to the non-railroad entity. In this manner, the original Depot parcels have decreased in size. A summary of the transactions that have caused each of the Depot parcels to attain its current description, as reflected in the attached Exhibit "A" survey, follows. These transactions serve a dual purpose: they document the current descriptions of each Depot parcel, and they support the CCG's reversionary interest in the East Commons parcels granted to the railroads.

## I.   *The Depot of the Muscogee Railroad Company (1854 Depot)*

The development of the Muscogee Railroad's Depot parcel over time is described above, with its final description occurring in 1854. When the East Commons was surveyed into blocks, the starting point of the Muscogee Railroad Depot parcel was found to be located in commons block number twenty-one (21). Beginning in 1854, the Muscogee Railroad (later the Southwestern Railroad) Depot parcel occupied the following plot of ground across commons blocks twenty-one (21), twenty-two (22), twenty-seven (27), and twenty-eight (28):

> Commencing due East on the South line of [13th] Street at a point 240 feet from the East line of City lots [in the city block across 6th Avenue from commons block 21][which point is 108 feet East of the Southeast corner of the intersection of 6th Avenue and 13th Street]

13

> thence running due South 1,182 feet 8 inches thence running due
> East 600 feet thence running due North 1,182 feet 8 inches thence
> running West 600 feet to the starting point.[9]

This description left space (108 feet) remaining in the West half of commons blocks twenty-one (21) and twenty-eight (28) fronting 6th Avenue for further development.[10] By 1890, Golden's Foundry desired to locate its business in the East Commons on block twenty-eight (28) and land was taken from the Muscogee Railroad Depot parcel for that purpose. At that time, the Southwestern Railroad had acquired the Muscogee Railroad and was leasing its real estate to the Central Railroad & Banking Company of Georgia. So, in November of 1890 the Southwestern Railroad and the Central Railroad & Banking Company quitclaimed to the Commissioners of Commons the following tract:

> Commencing at a point ninety-nine (99) feet North of the Southeast
> corner of block 28 and running thence North 30 feet to a point 10
> feet from the center of the Westernmost track of the Southwestern
> Railroad thence following said track at the same distance from its
> center in a Northerly direction until it strikes the Western line of said
> parcel of land so granted to the Muscogee Railroad a distance of
> about 350 feet thence South along said Western line 350 feet to the
> South line of said parcel thence East 195 feet to the point of
> beginning.[11]

A month later in December of 1890 the same parcel was conveyed by the Commissioners of Commons to Golden's Foundry. [Muscogee County Deed Book "DD" pages 495-496]. This parcel description also reveals that the South line of the 1854 Muscogee Railroad Depot parcel was ninety-nine (99) feet North of the North line of commons block 28 along 11th Street. Other non-railroad conveyances from the Commissioners of Commons accounted for the remainder of the

---

[9] Clerk of Council Record Book "B" June 12, 1854, pages 321-322.
[10] This space in commons block 21 was where the Union Passenger Station Depot was located in 1901. *See* Muscogee County Deed Book "NN" pages 150-152.
[11] Muscogee County Deed Book "DD" pages 494-495.

land composing the Golden's Foundry parcel.  The remainder of the 1854 Muscogee Railroad Depot parcel remains intact and occupied by the railroad.

## II.   *The Depot of the Montgomery & West Point Railroad (1859 Depot)*

The Depot parcels of the Montgomery & West Point Railroad and the Muscogee Railroad share a common point of beginning and a common boundary; the former Depot parcel being situated immediately North of the latter Depot parcel. This Northern parcel was created and described by the Mayor and City Council of Columbus in 1859 as follows:

> Beginning due East on the South line of [13th] Street at a point 240 feet from the East line of City lots [in the city block across 6th Avenue from commons blocks 21 and 20][which point is 108 feet East of the Southeast corner of the intersection of 6th Avenue and 13th Street], thence running due East 305 feet thence due North 1,000 feet thence due West 305 feet thence South 1,000 feet to the point of beginning.[12]

This 1859 Depot parcel runs North from the 1854 Depot parcel through 13th Street, through commons blocks twenty-one (21) and twenty (20), through 14th Street, and into commons block thirteen (13). In 1890, the mill of the Swift Manufacturing Company was located North of this 1859 Depot parcel on commons block thirteen (13) and the railroad conveyed the portion of the Depot parcel in block thirteen (13) North of 14th Street back to the Commissioners of Commons, as follows:

> Beginning at a point in commons block thirteen (13) 108 feet East from the Northeast corner of 6th Avenue on the North line of 14th Street thence North 210 feet 8 inches thence East 222 feet to the Southwestern Railroad right of way thence South 210 feet 11 inches to the North line of 14th Street thence West 204 feet 6 inches to the point of beginning.

---

[12] City Council Record Book "C" August 15, 1859, pages 582-584.

This parcel (about one acre), along with other portions of the 1859 Depot parcel, were then conveyed to the Swift Manufacturing Company. [Muscogee County Deed Book "DD" pages 492-493, 248-249]. Accounting for these conveyances, there remains of the 1859 Depot parcel a section in commons block twenty (20) and the original East line of the parcel comprising what would be 7th Avenue running from 13th Street through 14th Street. This area remains occupied by the railroad.

### III.    *The Depot of the Mobile & Girard Railroad (1869 Depot)*

When the Mayor and City Council of Columbus created a Depot parcel for the Mobile and Girard Railroad Company in 1869, a part of the Eastern half of the original 1847 Muscogee Railroad Depot parcel was used, and was extended South to 11th Street. This 1869 Depot parcel shares a border with the 1854 Depot parcel, as well as, a common Northern line along 13th Street. The original parcel description, recorded in an extract of the City Council minutes filed with the county deed records, was as follows:

> Situated immediately East of the present depot grounds of the South Western Rail Road (formerly Muscogee) beginning at the Northeast corner of said ground [which point is 708 feet East of the Southeast corner of the intersection of 6th Avenue and 13th Street] and running due East 600 feet, thence due South 1,281 feet 8 inches, thence running due West on the line of [11th] Street 600 feet, thence due North along the line of the present depot grounds of the South Western Rail Road to the starting point.[13]

The deed conveying this parcel detailed further that the parcel was "to be held and used by said Rail Road Company for no other purpose than a Rail Road depot, otherwise to revert to the Mayor and Council of Columbus, Georgia with all improvements thereon." This 1869 Depot parcel consisted of about sixteen (16) acres of land in the East Commons.[14] This parcel remains, for the most part, intact and occupied by the railroad.

---

[13] Muscogee County Deed Book "S" page 379.
[14] Muscogee County Deed Book 23, pages 337-339.

These three Depot parcels, together, account for about thirty-seven (37) acres in the East Commons, and it is these three parcels (the 1854, 1859, and 1869 Depot parcels) which are of interest in this report.

## D. REVERSION

Each of the three Depot parcels was created for an expressed depot purpose, included an expressed reversion clause, and detailed circumstances which would trigger the reversion clause—reverting title to the land to CCG. The reversion clauses for each of the three Depot parcels have been triggered, as is revealed by a comparison of the original conveyance language and the present use of the parcels by Norfolk Southern. The reversion of each parcel will be taken in turn, as follows:

### I.  *Reversion of the Muscogee Railroad Depot*

The 1854 Muscogee Railroad Depot parcel was conveyed "for the purpose of locating a Depot for said railroad Company" and "for no other than Rail Road purposes." This purpose implies the placement of a structure on the 1854 Depot parcel, and the Mayor and City Council contemplated the use of that structure as a Depot as a limitation on the conveyance, and restricted the use of the parcel to railroad purposes. This intent for a Depot purpose for the conveyance is further evidenced by the specific conditions of the conveyance. [Clerk of Council Record Book "A" June 30, 1847, pages 168-170].

The 1847 conditions of the conveyance of "a lot of ground on the East Commons for the purpose of locating a Depot" included (1) that "title shall **revert to the City** whenever the Muscogee Railroad Company shall cross the River at any point above [11th] Street," (2) "that said Rail Road Company or their Agents are not allowed the privilege of charging storage on any produce goods wares and merchandize which may be deposited at the Depot," and (3) that the

17

parcel shall not be exempt from taxation by the City. [Clerk of Council Record Book "A" June 30, 1847, pages 168-170].

The first condition relating to the Muscogee Railroad crossing the Chattahoochee River originated from the City and the railroad's mutual interest in the Depot being located in a "practicable" position within the City. [Clerk of Council Record Book "A" June 30, 1847, page 168]. The Muscogee Railroad was planned to run from Columbus to Macon. If the railroad was expanded to run further West than Columbus, then a bridge across the river would have been more easily located outside of the original plan of the City. The public land fronting the river in the North and South Commons was open for development by the railroads, and a rail line and bridge in those locations would not disrupt the street traffic and non-railroad developments within the City. This condition triggering reversion would permit the City to determine if the Depot structure should be relocated so that the railroad lines would remain outside of the inner plan of the City.

The second condition relates to the income generated by the Depot structure, and the City's desire to limit the railroad's use of the Depot structure to the basic freight and passenger functions of the Depot. Focusing on these two conditions, reversion has been triggered by two events.

### a.    *The Purpose and Limitation of the Conveyance has Ceased to Exist*

The 1854 Depot parcel, which was described as a "depot lot" in the 1854 resolution, was conveyed for the purpose of a structure being built on the land so the railroad could provide passenger services to Columbus. A structure was built on the parcel, but that structure was demolished and passenger services are no longer offered by the present railroad company occupying the parcel. Therefore, the parcel has ceased to serve the purpose for which the parcel was conveyed to the railroad, and title to the parcel has reverted to the CCG, as was originally contemplated to protect the public nature of the land.

This same event of termination of the depot purpose applies to all three Depot parcels. [Clerk of Council Record Books "A" June 30, 1847, pages 168-170, and "B" June 12, 1854, pages 321-322].

**b.**    *The Railroad has crossed the Chattahoochee River above 11th Street*

The first expressed condition of the conveyance, the occurrence of which triggers the reversion clause, has occurred. The Muscogee Railroad Company crossed the river above 11th Street by merger, consolidation, and acquisition of the local railroads into Norfolk Southern. The Southwestern Railroad was leased by the Central Railroad and Banking Company of Georgia in 1869.[15] The Central Railroad and Banking Company then purchased the Montgomery and West Point Railroad,[16] which possessed tracks and a bridge across the Chattahoochee River North of 16th Street in Columbus, in 1882.[17] It was not until 1951 that the Central Railroad and Banking Company became a majority shareholder of the Southwestern Railroad and effectively became the owner of the 1854 Depot parcel and a railroad track across the Chattahoochee River above 11th Street.[18] Therefore, the owner of the Muscogee Railroad Company became the owner of a railroad across the river above 11th Street by 1951.

Today, both the 1854 Depot parcel and the railroad lines running North of 11th Street across the Chattahoochee River are occupied by Norfolk Southern, which is a controlling shareholder of the Central Railroad and Banking Company of Georgia. In this manner, the Muscogee Railroad has effectively "crossed the River at [a] point above [11th] Street." Thus, the 1847 reversion clause has been triggered, and title to the 1854 Depot parcel has reverted to CCG. As this indirect crossing

---

[15] Muscogee County Deed Book "V" pages 442-446.
[16] Muscogee County Deed Books "R" pages 72-74 and "W" pages 521-523.
[17] City Council Record Book "B" August 1853, pages 192-194.
[18] *The Right of Way Magazine*. Vol. 51, No. 5. Online. https://www.cofga.org/railway/history/the-south-western-railroad-company/.

of the river occurred over a century after the conveyance took place, the reversion clause was likely unknown to the management of both CCG and the railroad, until now.

## II.    *Reversion of the Montgomery & West Point Railroad Depot*

The original intent of the Mayor and City Council for granting commons lands to the Montgomery and West Point Railroad was for "depot purposes." [Clerk of Council Records Book "B" August 2, 1853, page 193]. The conveyance of the 1859 Depot parcel in the East Commons was expressly founded on the purpose of the railroad building "houses" for operating "passenger" services. The location and operation of these Depot structures was the limitation on the land conveyed to the Montgomery and West Point Railroad. The intent for a structure to be located on the parcel is further evidenced by the conditions in the conveyances which limit the uses of the structures by prohibiting the charging of a fee for storage, as well as, the operation of accommodations for passengers on the parcel; specifically, hotels, taverns, and billiard rooms were prohibited. In the event that the railroad "fail[ed] to observe the restrictions, limitations, and conditions" included in the conveyance, the railroad would "**forfeit**" title to the parcel and its improvements and "**the same shall become the property of the Mayor and Council of the City of Columbus.**" [Clerk of Council Record Book "C" August 15, 1859, pages 582-584](emphasis added).

At the present time, a railroad structure, house, or building is not located on the 1859 Depot parcel and passenger services have ceased to be offered by the railroad. Therefore, the original purpose of the conveyance has ceased to exist and title to the 1859 Depot parcel has reverted to CCG.

### III.    *Reversion of the Mobile & Girard Railroad Depot*

The 1869 Depot parcel was conveyed to the Mobile and Girard Railroad Company "for the sole purpose of erecting thereon a Depot and the necessary buildings appertaining thereto" and the parcel was to be used by the railroad "**for no other purpose than a Rail Road depot**, otherwise to **revert to the Mayor and City Council of Columbus, Georgia** with all improvements thereon." The railroad was also prohibited from charging for storage of goods deposited at the Depot, and the parcel was to "always be subject to assessment and taxation by the City as other property in the city." [Clerk of Council Record Book "G" February 1, 1869, pages 38-39] [Muscogee County Deed Book "S" page 379](emphasis added).

The intent of the Mayor and City Council in conveying these parcels for Depot purposes is clear in this 1869 conveyance. The intended purpose of the conveyance was to permit the location and construction of a Depot structure on the parcel. A Depot structure is not presently situated on the parcel, and passenger services are no longer offered on the parcel through a Depot structure, as originally contemplated by the Mayor and City Council; therefore, the 1869 Depot parcel has reverted to CCG.

The validity of these reversion events and the return of title to these Depot parcels to CCG is supported by Georgia law, as discussed below.

### E.  LEGAL ANALYSIS

The use of reversion language, the occurrence of a reversionary event, and the triggering of reversion of title to CCG by the reversionary event, as discussed above, is supported by Georgia law as valid conveyances of land.

When determining how land was conveyed, "the intent of the parties is of prime importance." *Department of Transportation v. Knight*, 238 Ga. 225, 226 (1977); *see also Atlanta*

*Development Authority v. Clark Atlanta University, Inc.*, 298 Ga. 575, 580 (2016)("In construing a deed, the paramount consideration and overriding goal is to ascertain and give effect to the intent of the parties"). The law does not require that "precise technical words" be used to document a conveyance, and "omissions of formal language" will not control the type of conveyance if the intent of the parties is clear. *Knight*, 238 Ga. at 227-228. However, to overcome a presumption that fee simple title was conveyed, limiting language indicating a lesser estate (or a restriction on the use of the property conveyed) must have been used to convey the property. *Id*. at 226-227; *see also Taylor v. Smith*, 221 Ga. 55, 56 (1965)("any claim that there are restrictions upon the use of [the land] must be clearly established"); *see also* O.C.G.A. § 44-6-21 ("If a lesser estate is expressly limited, the courts shall not, by construction, increase such estate into a fee but, disregarding all technical rules, shall give effect to the intention of the maker of the instrument, as far as the same is lawful"). The court will look for limiting language in the deed, itself, and will consider the language used in the deed in the context of the circumstances and purpose of the deed. *See Clark Atlanta University*, 298 Ga. at 581 *citing Horwitz v. Weil*, 275 Ga. 467, 468 (2002). In other words, the court will look at the "**entire transaction**" to find the intended meaning of the words used in a deed conveying land. *Knight*, 238 Ga. at 228-229(emphasis added).

Limiting the use of conveyed land for a specific purpose is generally enforceable. *See Wills v. Pierce*, 208 Ga. 417, 418-419 (1951). In Georgia, restraints on alienation (conveyances which prevent the grantee from selling the property) are invalid. *See Clark Atlanta University*, 298 Ga. at 578. If, however, a designated use of a property applies generally to run with the land and apply to later grantees of the property, then the specific purpose conveyance is "valid and enforceable." *Wills v. Pierce*, 208 Ga. at 419. Stated another way, a grantor may not convey title to a grantee and limit the use of the property conveyed to only the grantee, as that would prevent that grantee from

selling the property. *See Statham v. Kelly*, 276 Ga. 877 (2003)("It is axiomatic that one cannot create a fee simple estate in certain property and simultaneously prohibit **entirely** the alienation or use of the property")(emphasis added).

While specific language is not required, certain phrases and words in a deed may reveal the intent of the parties. *See Knight*, 238 Ga. at 227. Words that restrict the continuance of an estate in land upon the occurrence of a specific event, or words that mark when the estate in land terminates, indicate a limitation on the estate. *See Franks v. Sparks*, 217 Ga. 117, 120-121 (1961). Under a limitation, the occurrence of the event automatically terminates the estate conveyed to the grantee. *Id*. at 121. The possibility of automatic termination of an estate creates a possibility of reversion of title to the grantor, and the grantor holds a reversionary interest in the property after it is conveyed. *See Clark Atlanta University*, 298 Ga. at 581. A reversionary interest is alienable; therefore, an assignee or successor of the grantor may possess the same reversionary interest as the grantor once held. *Id*. If a conveyance "provides for automatic reversion of the estate upon the occurrence of the limitation" then such language is a "hallmark" indication of a fee simple determinable estate, or a fee simple estate subject to limitation. *Id*. at 577, 581, *citing Flaum v. Middlebury*, 246 Ga. 682 (1980)(a fee simple determinable estate is a valid conveyance and creation of a reversionary interest, and is an alienable estate).

While a fee simple estate subject to limitation creates an alienable estate in the grantee, and an alienable reversionary interest in the grantor, a fee simple subject to a condition subsequent is a different estate, as the grantor's interest is not alienable. Words creating a condition subsequent mark the moment when the conveyed estate is capable of being defeated by a purposeful act of the grantor or the heirs of the grantor. *Franks v. Sparks,* 217 Ga. at 121. Under a conditional estate, the grantor must take action to reenter and repossess the estate. *Id*. at 121-122. The right of reentry

occurs upon the grantee's breach of the condition for which the estate was conveyed, and this right of reentry belongs only to the grantor and his heirs. *Id.* at 123 ("The general rule at common law is well settled that a right of reentry is not alienable or assignable. No stranger can take advantage of the condition"). Accordingly, the strongest distinction between a **limitation** and a **condition** is words indicating automatic reversion.

As for the Depot parcels at issue here, the distinction of a limitation or a condition upon the estate is of little consequence because the original grantor and the present holder of the reversion interest in the Depot parcels remain as the same entity: the Mayor and Council of Columbus. While the governmental structure of Columbus has changed since the Depot parcels were conveyed, CCG operates as the successor of the City of Columbus and would not be considered a "stranger" under an estate subject to a condition subsequent.[19] Nonetheless, the conveyance language applicable to each Depot parcel is clear as to which of these two estates (limited or conditional) was intended to be created by the Mayor and Council and the railroad companies.

Each conveyance limits the use of the parcel for "depot purposes," restricts the use of the parcel within that depot purpose, and specifically expresses a possibility of automatic reversion of interest to CCG. Under such language, the railroads took a fee simple determinable estate in the railroad parcels, which include a valid and enforceable reversionary interest in CCG. The language used in each conveyance will be reexamined as follows:

---

[19] The Depot parcels were conveyed by the Mayor and Council of the City of Columbus. CCG is the consolidation of the City of Columbus and the County of Muscogee. *See Bowen v. Columbus*, 256 Ga. 462 (1986). Therefore, the Mayor and Council of CCG are the heirs or successors of the Mayor and Council of the City of Columbus.

I.    *The 1854 Depot Parcel as a Fee Simple Determinable Estate*

Examining the "entire transaction" surrounding the creation and conveyance of the Muscogee Railroad Depot parcel requires examining the State legislative acts and the City Council resolutions from 1847, 1849, and 1854. *See Knight*, 238 Ga. at 228-229.

According to the City Council minutes for June 30, 1847, the meeting was "called at the request of a Committee of the Board of Directors of the Muscogee Rail Road Company who desired to make a proposition to Council in regard to obtaining a lot of ground on the East Commons **for the purpose of locating a Depot** . . . ." [Clerk of Council Records Book "A" page 168](emphasis added). City Council resolved to "authorize the Muscogee Rail Road Company to locate their Depot on the East Commons . . . to occupy a space of ground for said Depot and for no other than Rail Road purposes . . . provided the **title shall revert to the City** whenever the Muscogee Railroad Company shall cross the River at any point above [11th] Street." [Clerk of Council Records Book "A" June 30 and July 2, 1847, page 168-170](emphasis added). The Muscogee Railroad was also prohibited from "charging [for] storage" on any items "deposited at the Depot." [Clerk of Council Records Book "A" July 2, 1847, page 170]. This resolution was adopted by the City Council and was accepted by the Muscogee Railroad Company. *Id.* The General Assembly of the State of Georgia approved the resolution as a "fee simple" conveyance. [Ga. Laws 1847, page 166]. The resolutions that followed in 1849 and 1854 altered only the metes-and-bounds property description of the "Depot lot." [Clerk of Council Records Book "B" June 12, 1854, page 321]. The Georgia General Assembly also approved the 1849 alterations for the railroad to hold the new parcel "in fee simple . . . **for the purpose of a Railroad depot**." [Ga. Laws 1849, Pages 237-238](emphasis added).

The words used in this negotiated transaction indicate an intent to convey title to land, and to limit that title by including an occurrence beyond which the estate granted is restricted from continuing: when the Muscogee Railroad crossed the Chattahoochee River above 11th Street. The conveyance also expresses, in clear and plain language, a reversionary interest in the CCG. Automatic reversion is "the hallmark of a fee simple determinable estate;" therefore, this conveyance included a limitation, and transferred a valid fee simple determinable estate to the railroad, and reserved a reversionary interest in CCG. *See Franks v. Sparks*, 217 Ga. at 120-121; *see also Clark Atlanta University*, 298 Ga. at 580-581, *citing Flaum v. Middlebury*, 246 Ga. at 682. Reversion of title to the 1854 Depot parcel into CCG has occurred because the railroad has ceased to use the parcel for "the purpose of locating a Depot." Also, a successor in interest of the Muscogee Railroad Company crossed the Chattahoochee River above 11th Street,[20] which triggers the expressed reversion clause included in the conveyance. *See Clark Atlanta University*, 298 Ga. at 580-581 (the parcel, which was conveyed for particular "educational purposes" and would "revert" if the grantee ceased to use it for that purpose, reverted when the grantee ceased its use by selling the property); *see also Flaum v. Middlebury*, 246 Ga. at 682 (the grantee ceased to use the parcel for "roadway purposes" and the expressed reversion clause was triggered, reverting title to the grantor).

As revealed by the expressed conveyance language and the current use of the parcel conveyed, title to the 1854 Depot parcel, consisting of about fifteen (15) acres South of 13th Street and East of the Union Passenger Station and the Golden's Foundry parcels, is currently in CCG.

---

[20] The Muscogee Railroad and the Montgomery and West Point Railroad, which built a bridge and track across the river above 11th Street, are presently owned and operated by Norfolk Southern, which occupies the property of both of these railroad companies. Under these conditions, the owner of the Muscogee Railroad has crossed the river above 11th Street.

## II.    *The 1859 Depot Parcel as a Fee Simple Determinable Estate*

As seen in the 1854 Depot parcel, the 1859 Depot parcel of the Montgomery and West Point Railroad Company also evolved and was documented through legislative acts and more than one resolution of the City Council of Columbus. All of this documentation must be examined to understand the intent of the parties to the 1859 transaction. *See Knight*, 238 Ga. at 228-229.

First, in 1853 the Georgia General Assembly approved the incorporation of the Montgomery and West Point Railroad Company in Georgia, and authorized the railroad to "**locate and use a Depot on [its]** *own* **land**, in Georgia." [Ga. Laws 1853, page 446](emphasis added). The General Assembly spoke further by stating, "Said Rail Road Company shall not cross [the Chattahoochee] river . . . and shall not build [its] Depot at any other place, except at such place designated by the Mayor and City Council of Columbus." [Ga. Laws 1853, page 447].

In accordance with this State authorization, a member of the City Council of Columbus, who was "appointed in regards to locating the [Montgomery and West Point Railroad] Depot," delivered a report to City Council on August 2, 1853 from the president of the railroad. This report requested and recommended to City Council "that the City should grant to the Montgomery and W. P. R. Road Co. **for the location of its . . . depot lot**" a parcel in the North Commons. [Clerk of Council Records Book "B" pages 192-193](emphasis added). A specific parcel was recommended "**for depot purposes**" and the final agreement between the City Council and the railroad reveals a negotiated conveyance of "a piece of ground **for the purpose of a Rail Road Depot**" with a limitation that the railroad was not to connect its lines with the other railroads in town, or title to the "Depot lot . . . and all the buildings and improvements thereon shall be **immediately forfeited**" by the [Railroad] Company and shall **revert to the City of Columbus**."

[Clerk of Council Records Book "B" August 26, 1853, pages 199-200](emphasis added). Then, the railroad exchanged this parcel for land in the East Commons in 1859.

The routes of the local railroads in Columbus changed in 1857 when the Georgia General Assembly authorized the railroads to connect their tracks "by extending them through the city commons and streets of Columbus [with all improvements] as may be necessary for the convenience of freights and passengers." [Ga. Laws 1857, page 73]. Following this authorization, the president of the Montgomery and West Point Railroad approached the City Council of Columbus a second time to ask if the "depot lot" in the North Commons could be exchange for land in the East Commons "**to erect a through freight house** to be used by the Montgomery and West Point and Muscogee Rail Road Companies and **for the erection of a ware house** for the local business of the Montgomery and West P. Rail Road and to lay down track to a general **passenger House** hereafter to be constructed in front of the present Depot of the Muscogee Rail Road." [Clerk of Council Records Book "C" August 15, 1859, pages 582-583](emphasis added).

In response to this request, the City Council resolved that, in exchange for the land previously granted in the North Commons [excepting land for "through tracks" to and from the bridge across the river], and in consideration of (1) the "connection" of the local railroads on a common depot site in Columbus, and (2) "the **restrictions limitations** and **grants** hereafter to be mentioned and observed by [the Montgomery and West Point Railroad Company]," the railroad could relocate its Depot to the East Commons. [Clerk of Council Records Book "C" August 15, 1859, page 583](emphasis added).

The "restrictions" associated with the conveyance were as follows: (1) "at no time" will the railroad "charge or receive any compensation for the storage of any article or goods" stored at the depot, (2) the railroad will not "erect . . . keep or allow to be kept on said premises any hotel,

tavern, bar, billiard saloon, ten pin alley, or restaurant for the entertainment or refreshment of passengers on said Rail Roads but that the improvements thereon shall be limited strictly to a legitimately Rail Road business," and (3) "the premises and the improvements thereon shall pay to the Mayor and Council of the City of Columbus the same taxes as are levied and collected upon other property in the City of Columbus." [Clerk of Council Records Book "C" August 15, 1859, pages 584](emphasis added).

The "limitation[]" associated with the conveyance was, if the railroad "shall fail to observe the restrictions, limitations, and conditions . . . then the right title and interest of [the railroad] and those claiming under them in and to the above described premises and the improvements thereon shall be **forfeited** and the same **shall become the property of the Mayor and Council of the City of Columbus**." [Clerk of Council Records Book "C" August 15, 1859, pages 584](emphasis added).

The "grant[]" associated with the conveyance was "the **privilege** of receiving bringing and discharging its local freights **at a new depot to be erected on the East Commons of the City of Columbus**." [Clerk of Council Records Book "C" August 15, 1859, page 585](emphasis added).

First, the act of the General Assembly indicates the transfer of a limited title because the General Assembly authorized the railroad to locate a depot on its "**own land** . . . upon **such terms** as may be agreed upon." [Ga. Laws 1853, page 446-447](emphasis added). Second, the Montgomery and West Point parcels in the North and East Commons were conveyed as the result of negotiations between the railroad and the City in consideration of the construction of depot structures on the parcels with the intent that the railroad would use those structures for depot purposes. *See* Clerk of Council Record Books "B" pages 199-200 and "C" pages 583-585. Last, the conveyance does not use the word "revert" but such a technical word is not necessary to create

a reversion interest, and the omission of a technical word will not control the result of the words used. *See Knight*, 238 Ga. at 227-228. The conveyance clearly states that the railroad's title as to the "premises and the improvements thereon" would be "**forfeited**" and "**become the property of the Mayor and City Council**." [Clerk of Council Records Book "C" August 15, 1859, pages 584](emphasis added). This indicates a termination of the railroad's title upon the railroad's failure to observe the "conditions" of the conveyance, which included the operation of "a new depot to be erected on the East Commons of the City of Columbus." [Clerk of Council Records Book "C" August 15, 1859, pages 583-585]. Reversion of title to CCG is also expressed in clear and plain language. *See Georgia, Ashburn, Sylvester & Camilla Ry. Co. v. Johnson*, 226 Ga. 358, 362 (1970)(continuation of title was conditioned upon the construction and operation of a machine shop on the parcel, and when the grantee's operation of the shop ended title reverted to the grantor, pursuant to the terms of the conveyance).

A limitation on title is expressed in the words of the transaction for the 1859 Depot parcel, and reversion of title upon the occurrence of an event is clear from the language used; therefore, a valid fee simple determinable estate was granted to the Montgomery and West Point Railroad Company. *See Franks v. Sparks*, 217 Ga. at 120-121; *see also Clark Atlanta University*, 298 Ga. at 580-581, *citing Flaum v. Middlebury*, 246 Ga. at 682. A depot structure is not presently situated on the 1859 Depot parcel, and services associated with a depot structure have ceased to occur on the parcel. Therefore, the limitation event has occurred and reversion of title to CCG has been triggered. *See Camilla Ry. Co. v. Johnson*, 226 Ga. at 362; *see also* O.C.G.A. §§ 44-6-21, 44-6-60, 44-6-61, and 44-6-66 (the court shall enforce valid, intended reversions and the law favors vesting such interest in all cases of doubt).

### III.    *The 1869 Depot Parcel as a Fee Simple Determinable Estate*

The language used in the conveyance of the 1869 Depot parcel to the Mobile and Girard Railroad Company is plain and clear on the face of the extract of the City Council resolution from February 1, 1869, which was recorded in the Muscogee County Real Estate Records.

The president of the Mobile and Girard Railroad Company requested from the City Council of Columbus "the privilege of locating a Depot of said Road in the East Commons of said city." [Muscogee County Deed Book "S" page 379]. In response, the Mayor and Council resolved that a parcel of land in the East Commons would be granted to the railroad "**for the sole purpose of erecting thereon a Depot**." *Id.* (emphasis added). The land was "to be held and used" by the railroad "**for no other purpose than a Rail Road depot**; otherwise to **revert** to the Mayor and Council of Columbus, Georgia with all improvements thereon." *Id.* (emphasis added). The railroad was also restricted from charging for storage of goods at the Depot, and the property was to "always be subject to assessment and taxation by the city as other property in the city." *Id.*

The 1869 Depot parcel was the subject of a lawsuit between the Commissioners of the Commons and the Mobile and Girard Railroad Company in the late nineteenth century. The case was appealed up to the Georgia Supreme Court. The issues in the case did not involve reversion; rather, the Commissioners sought to eject the railroad from the parcel by claiming the original conveyance was invalid under two arguments: (1) the Mayor and Council that granted the parcel in 1869 was not the proper governing body of Columbus (due to the fact they were a military council appointed under the Reconstruction era government at the time), and (2) the Mayor and Council, generally, were not the authorized body for conveying land in the Columbus Commons prior to the creation of the Commissioners of Commons. Upon considering the history of the Commons, the public nature of the land and the public service/purpose of the railroads being

located there, and the relationship between the State and the Mayor and Council of Columbus as to the Commons, the Georgia Supreme Court ruled the conveyance was valid because (a) the Mayor and Council held management powers over the commons and (b) the Commissioners of Commons were only vested with title to land in the Commons that was not previously conveyed. *See Crawford v. Mobile and Girard Railroad Co.*, 67 Ga. 405 (1881).

For purposes of this report, the decision in *Crawford v. Mobile and Girard Railroad*, serves as a guide to the history of the Columbus Commons and the railroads located there, and to show that title to the 1869 Depot parcel was conveyed to the railroad (as opposed to the railroads having been granted an easement). An analysis of the words used in that conveyance will reveal the character and conditions of the title that was conveyed.

In obvious language, it is clear that the 1869 Depot parcel was transferred to the railroad "**for the sole purpose of erecting thereon a Depot**." [Muscogee County Deed Book "S" page 379](emphasis added). A specific reversion clause was also included: that title would "**revert** to the Mayor and Council of Columbus, Georgia" if the parcel was used for a purpose other than "a Rail Road depot." *Id.* (emphasis added).

This conveyance to the railroad was a valid transfer of title. *See Crawford v. Mobile and Girard Railroad Co.*, 67 Ga. at 420. Due to the fact that the conveyance expressed a clear limitation of title and a reversion interest in the grantor, the title conveyed was a fee simple determinable estate. *See Franks v. Sparks*, 217 Ga. at 120-121; *see also Clark Atlanta University*, 298 Ga. at 580-581, *citing Flaum v. Middlebury*, 246 Ga. at 682. Furthermore, due to the fact that a depot does not exist on the parcel, and that the activities associated with a depot structure do not occur on the parcel, title to the sixteen (16) acres composing the 1869 Depot parcel has reverted to CCG. *See Flaum v. Middlebury*, 246 Ga. at 682; *see also* O.C.G.A. §§ 44-6-21, 44-6-60, 44-6-61, and

44-6-66 (the court shall enforce valid, intended reversions and the law favors vesting such interest in all cases of doubt).

## V.    *Conclusion of Legal Analysis*

The language used in the transactions for conveying title from the Mayor and Council of Columbus to the railroads for the 1854, 1859, and 1869 Depot parcels reveals that these East Commons parcels were conveyed for the limited purpose of being used for the operation of a railroad depot. Also, it is expressed in plain language that should the railroads cease to use the parcels for depot purposes, then title to the parcel would revert back to the Mayor and Council of Columbus, Georgia. Such language, under Georgia law, transfers a valid fee simple determinable estate in the land, and the law favors the vesting of reversion interests in land. *See* O.C.G.A. § 44-6-60(c)("The rights of the reversioner are the same as those of a vested remainderman in fee); *see also* O.C.G.A. § 44-6-66("The law favors the vesting of remainders in all cases of doubt.") Norfolk Southern is the current occupant of the Depot parcels and does not operate or own a Depot on any of these three Depot parcels; therefore, the limit of its estate has been reached and title to the parcels has returned to CCG. In clear and plain language, the railroad and the Mayor and Council of Columbus indicated this was their intent in conveying the 1854, 1859, and 1869 Depot parcels.

## F.    SECOND RAILYARD IN EAST COMMONS

Two railyards exist in Columbus, Georgia between 6th and 10th Avenues. The first railyard discussed above, and the second railyard situated below 8th Street. The second railyard was granted to the Georgia Midland and Gulf Railway Company between 1882-1886 by the Commissioners of the Commons of Columbus, Georgia under "the same restrictions, limitations, and requirements as were imposed by the Mayor and Council on other railroads to which grants of Commons for railroad purposes have heretofore been made." [Muscogee County Deed Book "Z" pages 44-48].

It appears that most of this second railyard is no longer used by any railroad and, therefore, title has reverted as contemplated by the Mayor and Council in the resolutions cited for the first railyard discussed above. This second railyard contains about thirty (30) acres of land.

### G. **PROPOSAL**

CCG intends to pursue its property rights in the Railyards, but wishes to reach a mutually beneficial agreement with Norfolk Southern in regards to the future of the Railyards.

To reach a mutually beneficial agreement, CCG demands possession of the Railyards from Norfolk Southern, and in exchange for Norfolk Southern's compliance with this demand, CCG will agree to lease the Railyards back to Norfolk Southern under specific conditions, including, for an annual payment of Six Million ($6,000,000.00) Dollars for a non-renewable term of five (5) years. During the term of this proposed lease, Norfolk Southern must present, implement, and execute a plan for relocating the Railyards. The lease shall include deadlines for presenting the plan to CCG and executing scheduled phases of the relocation. Additional terms and conditions of the lease will be mutually negotiated.

A meeting between CCG, Norfolk Southern, and the parties' respective counsel is schedule to occur in Columbus, Georgia on Monday, May 1, 2023 beginning at 10:00 AM in the conference room of the law offices of Page, Scrantom, Sprouse, Tucker & Ford, P.C. located in the Synovus Centre at 1111 Bay Ave, Third Floor, Columbus, Georgia 31901. The purpose of this meeting will be to discuss the details of this report and proposal.

# EXHIBIT A

*[Survey of the Depot Parcels in the First Railyard]*



# **EXHIBIT B**

[*Railroad's Response to CCG's Demand for Possession*]

Law Offices

# HALL, BLOCH, GARLAND & MEYER, LLP

**Macon Office**
J. Steven Stewart
Duncan D. Walker, III
Mark E. Toth
J. Ellsworth Hall, IV
Amanda Rodman Smith
Walker S. Stewart
J. Burton Wilkerson, Jr.
John A. Wilkerson
Lee M. Gillis, Jr.
John M. McMichael

1500 Fickling & Company Building
577 Mulberry Street
P. O. Box 5088
**MACON, GEORGIA 31208-5088**

Telephone 478-745-1625
Facsimile 478-741-8822
www.hbgm.com

**Atlanta Office**
Daryl G. Clarida
Peter G. Golden
Hilary Houston Adams
Boniface G. Echols
Donna Johnson

900 Circle 75 Pkwy
Suite 500
Atlanta, GA 30339-3099
Telephone 678-888-0036
Facsimile 678-379-6124

*Writer's Direct Dial: 478-803-8001*
*Email: stevestewart@hbgm.com*

April 21, 2023

Jack P. Schley
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
P.O. Box 1199
Columbus, GA 31902

*Via Federal Express and E-mail:*
*jschley@pagescrantom.com*

> Re:   **Norfolk Southern Rail Yard and Spiderweb Project – Columbus, Georgia**

Dear Mr. Schley,

I am writing on behalf of and as counsel for Norfolk Southern Railway Company and its wholly-owned subsidiary, Central of Georgia Railroad Company (collectively, "NS"), in response to your letter of April 12, 2023, directed to Ms. Nabanita Nag, Mr. Andrew Vollmer and myself. As you know, that letter addressed two issues – NS' rail yard in Columbus, Georgia, and what you termed the "spiderweb project" on Buena Vista Road.

Regarding the rail yard, NS certainly appreciates the depth of historical research performed on behalf of the Consolidated Government of Columbus, Georgia ("CCG") as reflected in the memo that accompanied your letter. NS does not concede the assertions made with respect to terms and conditions of the various granting authorities detailed in the memo and, in light of the overarching principle of federal preemption discussed below, NS will not respond to those assertions here.

The fundamental outcome sought by CCG is the abandonment of NS' rail yard. Whatever weight the granting authorities may have had in that regard under state law at the time of their implementation has since been entirely overcome by federal law. Abandonment of rail lines was brought under the exclusive authority of the Interstate Commerce Commission ("ICC") pursuant to the Interstate Commerce Act as amended by the Transportation Act of 1920, *see Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981) (Addressing "[t]he exclusive and plenary nature of the [ICC]'s authority to rule on carriers' decisions to abandon lines ...."), which exclusive authority was recodified under 49 U.S.C. § 10903(a) and now resides with the U.S. Surface Transportation Board.

Law Offices
**HALL, BLOCH, GARLAND & MEYER, LLP**

Jack P. Schley
April 21, 2023
Page 2

       Accordingly, any attempt by CCG to utilize Georgia state law to compel abandonment of NS' rail yard would be preempted by federal law.  Under the circumstances, NS respectfully declines to provide the information requested in your letter.

       As for the "spiderweb project," CCG has had, and will continue to have, NS' cooperation on this project.  There is a current cost-sharing agreement in place between NS and CCG. Currently, NS is awaiting notice from CCG of its intent to progress to the next phase of the project, including a schedule and the selection of a bridge contractor.

       In light of the foregoing, it is unlikely that a meeting between NS and CCG will produce any meaningful result.  Accordingly, NS respectfully declines the invitation to meet on May 1.

       Sincerely,

       HALL, BLOCH, GARLAND & MEYER, LLP

By:

       J. Steven Stewart

JSS/npe

# **EXHIBIT C**

[*CCG Council Resolution Number 171-23*]



Page, Scrantom, Sprouse, Tucker & Ford, P.C.

JACK P. SCHLEY
DIRECT: (706) 243-5614
FAX: (706) 243-0417
EMAIL: jschley@pagescrantom.com

October 25, 2023

**Via U.S. Certified and**
**Regular Mail & Email**
Norfolk Southern Corp.
Attn: J. Steven Stewart
577 Mulberry St. 1500
Macon, Georgia 31201
stevestewart@hbgm.com

Re:    ***Reversion of Title to the Norfolk Southern Railyards in Columbus, Georgia &***
       ***Recission of Resolutions Granting Use of the Railyards by Columbus Council***

Mr. Stewart:

I received your letter dated April 21, 2023 on behalf of Norfolk Southern Railway Corporation and its subsidiary, Central of Georgia Railroad Company (hereinafter collectively "NS"), responding to my letter dated April 12, 2023 on behalf of the Consolidated Government of Columbus, Georgia (hereinafter "CCG").

As discussed in our initial letter, there are two railyards in Columbus each made of separate parcels created by resolutions of the City Council of Columbus, Georgia between 1847 and 1886. The first railyard and its parcels are illustrated in the map attached to our initial letter and reattached here for convenience as Exhibit "A." The resolutions for the second railyard reference only city commons lots distinguished in the plan of Columbus, Georgia.

We are aware of the Interstate Commerce Commission Termination Act of 1995 and your argument for the exclusive jurisdiction of the Surface Transportation Board ("STB") for abandonment of main line rail tracks pursuant to 49 U.S.C.A. § 10501(b). It is CCG's position that the parcels which have reverted are not subject to the STB's jurisdiction because they do not contain main line tracks and constitute only "spur, industrial, team, switching, or side tracks" which the STB does not have authority over pursuant to 49 U.S.C.A. § 10906. Specifically, all of parcels A, B, and most—if not all—of C and E on Exhibit "A" attached hereto are not occupied by main line tracks. Also, most—if not all—of the second railyard is unoccupied by any tracks, or is occupied only in part by non-main line tracks. Therefore, NS may negotiate with CCG to abandon these parcels without the need for legal action or involvement by the STB.

Also, as detailed in our initial letter, all of the parcels within the railyards are occupied by NS pursuant to city council resolutions from the nineteenth century and not pursuant to a conveyance by deed of record. Enclosed with this letter you will find a copy of Resolution No. 171-23 adopted by the Council of CCG on May 23, 2023 which rescinds those prior resolutions

Columbus Railyards & Resolutions
Page 2
October 25, 2023

permitting the railroads' occupancy of the railyards. Therefore, NS is occupying the railyards without proper authorization and this occupation constitutes a continuing trespass against CCG's property interests. Furthermore, based upon information and belief, NS's activities within the railyards have damaged the property and the damage constitutes a nuisance to public health. We hereby demand that NS take immediate action to abate all nuisances which exist in the railyards.[1]

Pursuant to 49 U.S.C.A. § 10906 and Resolution No. 171-23, and on behalf of CCG, we renew our demand for possession of the railyards as well as our request to NS to have its representatives attend a meeting with representatives for CCG to discuss a mutually beneficial future for the railyards. We also renew our request that ten (10) days prior to this meeting NS produce to the undersigned information regarding NS' current use of the railyards, including, the quantity of traffic through the railyards, the specific origins, destinations, and customers of the traffic, the role of the railyards for facilitating that traffic, and whether NS charges and/or receives payment for storage in the railyards. Please also produce any documents supporting NS' claim of title to the railyards, if any. Additionally, please identify all railroad and non-railroad entities known to you, if any, which lease, access, or otherwise use any part or potion of the railyards, under your direction or otherwise.

Your written response to this letter with specific proposals for meeting dates in Columbus would be appreciated. Please issue such a response to the undersigned on or by November 6, 2023.

We look forward to your continued prompt attention to this matter.

Sincerely,

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By: _____

Jack P. Schley

JPS/ljw
  (Enclosures)
cc: Jim Clark
    Thomas Gristina
    Clifton Fay, City Attorney
    Skip Henderson, Mayor
    Isaiah Hugley, City Manager
    (all via email only)

---

[1] This is not an exhaustive list of CCG's claims against NS, and CCG does not waive any of its claims and hereby expressly reserves and preserves all of its claims and legal theories against NS. This letter is intended to further negotiations between CCG and NS to prevent a lawsuit; therefore, this letter is privileged pursuant to O.C.G.A. § 24-4-408 and all other applicable laws.



# RESOLUTION

## NO. __171-23__

### A RESOLUTION RESCINDING THE PRIOR RESOLUTIONS GRANTING LAND IN THE EAST COMMONS TO THE RAILROADS FOR DEPOT PURPOSES.

**WHEREAS**, the original plan of Columbus, Georgia included land around the city called "commons" which was designated and intended to be used for public purposes;

**WHEREAS**, access to passenger services offered by railroad companies was at one time deemed a public purpose sufficient for use of the commons;

**WHEREAS**, on June 30, 1847[1], the Muscogee Railroad Company requested from City Council a piece of ground in the East Commons for the purpose of locating a passenger depot;

**WHEREAS**, the City Council of Columbus, Georgia approved the request on July 2, 1847 and subsequently clarified and amended its approval on December 11, 1849[2] and again on June 12, 1854[3] to provide a specific parcel of ground in the East Commons for depot purposes;

**WHEREAS**, Council's approval was for "a lot of ground on the East Commons for the purpose of locating a Depot" and Council required the land "shall revert to the City whenever the Muscogee Railroad Company shall cross the River at any point above [11th] Street;"

**WHEREAS**, the depot parcel described by Council on June 12, 1854 remains intact, more or less, and occupied by Norfolk Southern Railway Company, a successor railroad entity of the Muscogee Railroad Company;

**WHEREAS**, Norfolk Southern does not offer passenger services in Columbus and the Muscogee Railroad depot parcel in East Commons has ceased to be used for railroad depot purposes as originally contemplated by Council;

**WHEREAS**, by mergers, acquisitions, and consolidations of railroad companies the successor in interest of the Muscogee Railroad Company did "cross the River at [a] point above [11th] Street."

**WHEREAS**, title to the Muscogee Railroad depot parcel in the East Commons is not recorded in the real estate records of Muscogee County;

**WHEREAS**, the Montgomery & West Point Railroad Company also requested land in the Columbus Commons for the purpose of locating a passenger depot[4];

---

[1] Clerk of Council Records Book "A" for 1847, Pages 168-170.
[2] Clerk of Council Records Book "A" for 1849, Page 414.
[3] Clerk of Council Records Book "B" for 1854, Pages 321-322.
[4] Clerk of Council Records Book "B" for 1853, Page 193; Clerk of Council Records Book "C" for 1859, Page 582.

**WHEREAS**, Council approved the request on August 15, 1859 and appropriated land in the East Commons for the Montgomery & West Point Railroad Company's purpose, to wit: "to erect a through freight house to be used by the Montgomery & West Point Railroad and the Muscogee Railroad Companies and for the erection of a warehouse for the local business of the Montgomery & West Point Railroad and to lay down a track to a general passenger house . . .";

**WHEREAS**, Council's appropriation of land in the East Commons for the Montgomery & West Point Railroad Company included a reversion of title to the land to the Mayor and Council of Columbus, Georgia if the Montgomery & West Point Railroad Company failed to comply with the terms of the grant;

**WHEREAS**, the parcel of ground described by Council on August 15, 1859 remains intact, more or less, and occupied by Norfolk Southern Railway Company, a successor railroad entity of the Montgomery & West Point Railroad Company;

**WHEREAS**, Norfolk Southern does not offer passenger services in Columbus, does not maintain a warehouse of any kind on the parcel provided by Council, and the Montgomery & West Point Railroad depot parcel in East Commons has ceased to be used for depot purposes as originally contemplated by Council;

**WHEREAS**, the Mobile & Girard Railroad Company also requested land in the East Commons of Columbus for the purpose of locating a depot[5];

**WHEREAS**, Council approved the request on February 1, 1869 and appropriated land in the East Commons "to the Mobile & Girard Railroad Company for the sole purpose of erecting thereon a Depot . . .";

**WHEREAS**, Council's approval was conditioned on the parcel being used "for no other purpose than a Railroad depot, otherwise to revert to the Mayor and Council of Columbus, Georgia with all improvements thereon";

**WHEREAS**, the parcel of ground described by Council on February 1, 1869 remains intact, more or less, and occupied by Norfolk Southern Railway Company, a successor railroad entity of the Mobile & Girard Railroad Company;

**WHEREAS**, Norfolk Southern does not offer passenger services in Columbus and the Mobile & Girard Railroad depot parcel in East Commons has ceased to be used for railroad depot purposes as originally contemplated by Council;

**WHEREAS**, the Georgia Midland & Gulf Railway Company also requested land in the East Commons of Columbus for the purpose of accessing the depot of the Muscogee Railroad Company[6];

---

[5]Clerk of Council Records Book "G" for 1869, Pages 38-39.
[6]Clerk of Council Records Book "I" for 1886, Pages 135, 156-157.

**WHEREAS**, Council approved the requests on January 6 and May 5, 1886, and appropriated land in the East Commons to the Georgia Midland & Gulf Railway Company subject to the "condition that said Rail Road Company shall be liable to the same restrictions, limitations, and requirements as were imposed by the Mayor and Council on other railroads to which grants of Commons for railroad purposes have heretofore been made.";

**WHEREAS**, Council's approval was conditioned on the understanding that the land would revert to the Mayor and Council if the railroad ceased to use the property for the intended purpose;

**WHEREAS**, the parcel of ground described by Council on January 6 and May 5, 1886, remains intact, more or less, and controlled by Norfolk Southern Railway Company, a successor railroad entity of the Georgia Midland & Gulf Railway Company;

**WHEREAS**, Norfolk Southern does not offer passenger services in Columbus and the Georgia Midland & Gulf Railway Company parcels in East Commons have ceased to be used for railroad and depot purposes as originally contemplated by Council;

**WHEREAS**, Council contemplated the termination of depot services by the railroad on the East Commons parcels and intended to protect the public nature and purpose of the Columbus Commons upon such an occurrence by including terms of reversion in each resolution granting land in the East Commons to the railroads; and

**WHEREAS**, all title and interest, including all reversionary interest, in the commons is vested in Columbus, Georgia, a consolidated City-County Government, ("Columbus, Georgia") by the General Assembly of the State of Georgia.

## NOW, THEREFORE, THE COUNCIL OF COLUMBUS, GEORGIA, HEREBY RESOLVES AS FOLLOWS:

That the reversion events contemplated by Council have occurred causing title to the railroad and depot parcels in East Commons to revert to Columbus, Georgia as was intended by Council at the time of each Resolution.

That the 1847, 1849, 1854, 1859, 1869, 1886, and all other Resolutions of Council granting Commons parcels to railroad companies for depot purposes are hereby rescinded. The City Attorney or his representative is authorized to execute appropriate documents on behalf of Council in this matter.

———————————————

Introduced at a regular meeting of the Council of Columbus, Georgia, held the 23rd day of May 2023 and adopted at said meeting by the affirmative vote of ___seven___ members of said Council.

3

Resolution No. 171-23

| | | |
|---|---|---|
| Councilor Allen | voting | _ ABSENT FOR VOTE _ |
| Councilor Barnes | voting | _ABSENT__ |
| Councilor Begly | voting | ___ NO ____ |
| Councilor Cogle | voting | ___YES____ |
| Councilor Crabb | voting | ___YES____ |
| Councilor Davis | voting | ___YES____ |
| Councilor Garrett | voting | ___YES____ |
| Councilor Huff | voting | ___YES____ |
| Councilor Thomas | voting | ___YES____ |
| Councilor Tucker | voting | ___YES____ |

**Sandra T. Davis**
Clerk of Council

**B. H. "Skip" Henderson, III**
Mayor

4

# **EXHIBIT D**

*[Railroad's Response to CCG Resolution Number 171-23]*

Law Offices
## HALL, BLOCH, GARLAND & MEYER, LLP

1500 Fickling & Company Building
577 Mulberry Street
P. O. Box 5088
### MACON, GEORGIA 31208-5088

**Macon Office**
J. Steven Stewart
Duncan D. Walker, III
Mark E. Toth
J. Ellsworth Hall, IV
Amanda Rodman Smith
J. Burton Wilkerson, Jr.
John A. Wilkerson
Lee M. Gillis, Jr.
John M. McMichael

**Atlanta Office**
Daryl G. Clarida
Peter G. Golden
Hilary Houston Adams
Donna Johnson

Telephone 478-745-1625
Facsimile 478-741-8822
www.hbgm.com

900 Circle 75 Pkwy
Suite 500
Atlanta, GA 30339-3099
Telephone 678-888-0036
Facsimile 678-379-6124

*Writer's Direct Dial: 478-803-8001*
*Email: stevestewart@hbgm.com*

November 2, 2023

Jack P. Schley
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
P.O. Box 1199
Columbus, GA 31902

*Via Federal Express and E-mail:*
*jschley@pagescrantom.com*

    **Re:**    **Norfolk Southern Rail Yard – Columbus, Georgia**

Dear Mr. Schley:

In reply to your October 25, 2023 letter, Norfolk Southern respectfully disagrees with your interpretation of the preemptive effect of the ICC Termination Act (ICCTA) on CCG's attempt to eject Norfolk Southern from its yard in Columbus.

Your letter correctly notes that 49 U.S.C. § 10906 permits Norfolk Southern to abandon yard tracks without regulatory intervention or approval by the Surface Transportation Board (STB). However, when 49 U.S.C. §§ 10101(b) and 10906 are read together, as they must be, it is equally clear that Congress' delegation of exclusive jurisdiction to the STB over the regulation of rail transportation was intended to broadly preempt state law claims that interfere with rail carrier operations. As a result, when properly interpreted and applied, ICCTA will be found to federally preempt CCG's efforts to take Norfolk Southern's property against its will through claims asserted under state law.

To reiterate a point made in my April 21, 2023 letter, Norfolk Southern also disagrees with CCG's claim of ownership under the terms and conditions of the various granting authorities. However, in light of federal preemption under ICCTA, no further response is necessary in that regard. The Resolution adopted by Council on May 23, 2023 doesn't change this conclusion.

For the reasons stated above, it follows that there is no basis for CCG's assertion that Norfolk Southern's operation of its yard in Columbus constitutes a continuing trespass (or a trespass of any kind), and Norfolk Southern rejects CCG's demand for possession. Likewise, the renewed proposal to schedule a meeting is respectfully declined.

Law Offices
**HALL, BLOCH, GARLAND & MEYER, LLP**

Jack P. Schley
November 2, 2023
Page 2

    Finally, with respect to the demand that Norfolk Southern take immediate action to abate alleged nuisances in the yard, your letter did not provide Norfolk Southern with any actionable information. If CCG elects to provide information concerning the specific location and nature of any alleged nuisances, Norfolk Southern will consider the matter further.

                      Sincerely,

                      HALL, BLOCH, GARLAND & MEYER, LLP

                      By:

                      J. Steven Stewart

JSS/npe

# IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
## STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**AUG 28, 2025 01:14 PM**

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

CIVIL ACTION NUMBER  <u>SU2025CV001918</u>

Consolidated Government of Columbus,
Georgia

_____

**PLAINTIFF**

**VS.**

Norfolk Southern Corp.
Norfolk Southern Railway Company
Central of Georgia Railroad Company
The South-Western Rail Road Company
Genesee & Wyoming Railroad Services, Inc.
Columbus & Chattahoochee Railroad, Inc.
Georgia Southwestern Railroad, Inc.

_____

**DEFENDANTS**

## SUMMONS

TO: NORFOLK SOUTHERN CORP.

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **Jack P Schley**
> **Page, Scrantom, Sprouse,Tucker & Ford, PC**
> **PO Box 1199**
> **Columbus, Georgia 31902-1199**
> **jps@psstf.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 28th day of August, 2025.**

Clerk of Superior Court

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY**
**STATE OF GEORGIA**

_____
                                    Danielle F. Forté, Clerk
                                    Muscogee County, Georgia

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY**
**STATE OF GEORGIA**

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**AUG 28, 2025 01:14 PM**

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

CIVIL ACTION NUMBER  <u>SU2025CV001918</u>

Consolidated Government of Columbus,
Georgia

_____

**PLAINTIFF**

                                    **VS.**

Norfolk Southern Corp.
Norfolk Southern Railway Company
Central of Georgia Railroad Company
The South-Western Rail Road Company
Genesee & Wyoming Railroad Services, Inc.
Columbus & Chattahoochee Railroad, Inc.
Georgia Southwestern Railroad, Inc.

_____

**DEFENDANTS**

**SUMMONS**

TO: NORFOLK SOUTHERN RAILWAY COMPANY

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **Jack P Schley**
> **Page, Scrantom, Sprouse,Tucker & Ford, PC**
> **PO Box 1199**
> **Columbus, Georgia 31902-1199**
> **jps@psstf.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 28th day of August, 2025.**

                        Clerk of Superior Court

SC-1
Rev'd 10/24

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY**
**STATE OF GEORGIA**

_____
Danielle F. Forté, Clerk
Muscogee County, Georgia

# IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
## STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**AUG 28, 2025 01:14 PM**

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

CIVIL ACTION NUMBER  <u>SU2025CV001918</u>

Consolidated Government of Columbus, Georgia

---

**PLAINTIFF**

**VS.**

Norfolk Southern Corp.
Norfolk Southern Railway Company
Central of Georgia Railroad Company
The South-Western Rail Road Company
Genesee & Wyoming Railroad Services, Inc.
Columbus & Chattahoochee Railroad, Inc.
Georgia Southwestern Railroad, Inc.

---

**DEFENDANTS**

## SUMMONS

TO: CENTRAL OF GEORGIA RAILROAD COMPANY

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **Jack P Schley**
> **Page, Scrantom, Sprouse,Tucker & Ford, PC**
> **PO Box 1199**
> **Columbus, Georgia 31902-1199**
> **jps@psstf.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 28th day of August, 2025.**

Clerk of Superior Court

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY**
**STATE OF GEORGIA**

_____

Danielle F. Forté, Clerk
Muscogee County, Georgia

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY**
**STATE OF GEORGIA**

☰ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**AUG 28, 2025 01:14 PM**

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

CIVIL ACTION NUMBER  SU2025CV001918

Consolidated Government of Columbus,
Georgia

_____

**PLAINTIFF**

**VS.**

Norfolk Southern Corp.
Norfolk Southern Railway Company
Central of Georgia Railroad Company
The South-Western Rail Road Company
Genesee & Wyoming Railroad Services, Inc.
Columbus & Chattahoochee Railroad, Inc.
Georgia Southwestern Railroad, Inc.

_____

**DEFENDANTS**


**SUMMONS**

TO: THE SOUTH-WESTERN RAIL ROAD COMPANY

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or
plaintiff's attorney, whose name, address and email address are:

**Jack P Schley**
**Page, Scrantom, Sprouse,Tucker & Ford, PC**
**PO Box 1199**
**Columbus, Georgia 31902-1199**
**jps@psstf.com**

an answer to the complaint which is herewith served upon you. You must make your answer
within 30 days after service of this summons upon you. This time excludes the day of service. If
you fail to answer, the court will issue a default judgment against you for the relief sought in the
complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or
before the scheduled hearing date attached.

**This 28th day of August, 2025.**

Clerk of Superior Court

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA**

_____
Danielle F. Forté, Clerk
Muscogee County, Georgia

# IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
## STATE OF GEORGIA

⚖ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**AUG 28, 2025 01:14 PM**

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

CIVIL ACTION NUMBER  SU2025CV001918

Consolidated Government of Columbus,
Georgia

_____

**PLAINTIFF**

**VS.**

Norfolk Southern Corp.
Norfolk Southern Railway Company
Central of Georgia Railroad Company
The South-Western Rail Road Company
Genesee & Wyoming Railroad Services, Inc.
Columbus & Chattahoochee Railroad, Inc.
Georgia Southwestern Railroad, Inc.

_____

**DEFENDANTS**

## SUMMONS

TO: GEORGIA SOUTHWESTERN RAILROAD, INC.

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> **Jack P Schley**
> **Page, Scrantom, Sprouse,Tucker & Ford, PC**
> **PO Box 1199**
> **Columbus, Georgia 31902-1199**
> **jps@psstf.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 28th day of August, 2025.**

Clerk of Superior Court

**IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
STATE OF GEORGIA**

_____

Danielle F. Forté, Clerk
Muscogee County, Georgia

**General Civil and Domestic Relations Case Filing Information Form**

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

☑ **Superior** or ☐ **State Court of** _Muscogee_____ **County**

**SU2025CV001918**

| For Clerk Use Only | |
|---|---|
| **Date Filed** 08-28-2025 | **Case Number** SU2025CV001918 |
| **MM-DD-YYYY** | |

AUG 28, 2025 01:14 PM

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

**Plaintiff(s)**

Consolidated Government of Columbus, Georgia

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

Norfolk Southern Corp.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

Norfolk Southern Railway Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

Central of Georgia Railroad Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

The South-Western Rail Road Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** Schley, Jack P     **Bar Number** 891829     **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

**General Civil Cases**
- ☐ **Automobile Tort**
- ☐ **Civil Appeal**
- ☐ **Contract**
- ☐ **Contempt/Modification/Other Post-Judgment**
- ☐ **Garnishment**
- ☐ **General Tort**
- ☐ **Habeas Corpus**
- ☐ **Injunction/Mandamus/Other Writ**
- ☐ **Landlord/Tenant**
- ☐ **Medical Malpractice Tort**
- ☐ **Product Liability Tort**
- ☑ **Real Property**
- ☐ **Restraining Petition**
- ☐ **Other General Civil**

**Domestic Relations Cases**
- ☐ **Adoption**
- ☐ **Contempt**
  - ☐ **Non-payment of child support, medical support, or alimony**
- ☐ **Dissolution/Divorce/Separate Maintenance/Alimony**
- ☐ **Family Violence Petition**
- ☐ **Modification**
  - ☐ **Custody/Parenting Time/Visitation**
- ☐ **Paternity/Legitimation**
- ☐ **Support – IV-D**
- ☐ **Support – Private (non-IV-D)**
- ☐ **Other Domestic Relations**

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
**Case Number**                       **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____
**Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____

## SHERIFF'S ENTRY OF SERVICE

**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

SEP. 19, 2025 01:00 PM

Danielle F. Forté, Clerk
Muscogee County, Georgia

_____ BIBB _____ County, Georgia

Civil Action No. Muscogee SU25CV1918

Date Filed August 28, 2025

Superior Court ☑
State Court ☐

Attorney's address and email

P.O. Box 1199

Columbus, Georgia 31902-1199

jschley@pagescrantom.com

Name and Address of Party to be served

J. Steven Stewart (Registered Agent)

577 Mulberry St. (1500)

Macon, Georgia 31201

Consolidated Government of Columbus, Georgia

_____

Plaintiff(s)

V.

Norfolk Southern Corp.,

Central of Georgia Railroad Co., et. al.

Defendant(s)

_____

Garnishee

☐ **(PERSONAL)** I have this day served the defendant _____ personally with a copy of the within action and summons and complaint.

☐ **(NOTORIOUS)** I have this day served the defendant _____ by leaving a copy of the action and summons and complaint at the defendant's most notorious place of abode in this county.

I delivered the summons and complaint into hands of _____ described as follows: Age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

■ **(CORPORATION)** I served the defendant Central of Georgia Railroad Company, a corporation, by leaving a copy of the within action and summons and complaint with J. Steven Stewart (Registered Agent) in charge of the corporation's office and place of doing business of said corporation in this county.

☐ **(TACK & MAIL)** I have this day served the above styled affidavit and summons on the defendant by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant to answer said summons at the place stated in the summons.

☐ **(NON EST)** I made a diligent search, and I did not find the defendant _____ in the jurisdiction of this Court.

This _8th_ day of ___Sep.___, 20 _25_.

_____ #1457
Deputy Sheriff

SC-2
Rev'd 1/25

## SHERIFF'S ENTRY OF SERVICE

BIBB _____ County, Georgia

Civil Action No. Muscogee SU25CV1918

Date Filed August 28, 2025

Superior Court ☑

State Court ☐

**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**
RECEIVED
SEP 19, 2025 01:00 PM

Danielle F. Forté, Clerk
Muscogee County, Georgia

AUG 29 2025
CIVIL PROCESS-BCSO

Consolidated Government of Columbus, Georgia
_____

Attorney's address and email

P.O. Box 1199

Columbus, Georgia 31902-1199

jschley@pagescrantom.com

_____ Plaintiff(s)

V.

Norfolk Southern Corp.,

Norfolk Southern Railway Co., et. al.

Name and Address of Party to be served

J. Steven Stewart (Registered Agent)

577 Mulberry St. (1500)

Macon, Georgia 31201

_____ Defendant(s)

_____ Garnishee

☐ **(PERSONAL)** I have this day served the defendant _____ personally with a copy of the within action and summons and complaint.

☐ **(NOTORIOUS)** I have this day served the defendant _____ by leaving a copy of the action and summons and complaint at the defendant's most notorious place of abode in this county.

I delivered the summons and complaint into hands of _____described as follows: Age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

■ **(CORPORATION)** I served the defendant Norfolk Southern Railway Company_____, a corporation, by leaving a copy of the within action and summons and complaint with J. Steven Stewart (Registered Agent)____ in charge of the corporation's office and place of doing business of said corporation in this county.

☐ **(TACK & MAIL)** I have this day served the above styled affidavit and summons on the defendant by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant to answer said summons at the place stated in the summons.

☐ **(NON EST)** I made a diligent search, and I did not find the defendant _____ in the jurisdiction of this Court.

This 8th day of Sept. _____, 20 25.

_____ # 1657
Deputy Sheriff

SC-2
Rev'd 1/25

## SHERIFF'S ENTRY OF SERVICE

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

SEP 19, 2025 01:00 PM

Danielle F. Forté, Clerk
Muscogee County, Georgia

BIBB _____ County, Georgia

Civil Action No. Muscogee SU25CV1918

Date Filed August 28, 2025

Superior Court ☑
State Court ☐

RECEIVED
AUG 29 2025
0170 65 0050
CIVIL PROCESS

Consolidated Government of Columbus, Georgia
_____

_____

Plaintiff(s)

V.

Norfolk Southern Corp.
_____

et. al.
_____

Defendant(s)

_____

Garnishee

Attorney's address and email
P.O. Box 1199
_____
Columbus, Georgia 31902-1199
_____
jschley@pagescrantom.com
_____
Name and Address of Party to be served
J. Steven Stewart (Registered Agent)
_____
577 Mulberry St. (1500)
_____
Macon, Georgia 31201
_____

☐ **(PERSONAL)** I have this day served the defendant _____ personally with a copy of the within action and summons and complaint.

☐ **(NOTORIOUS)** I have this day served the defendant _____ by leaving a copy of the action and summons and complaint at the defendant's most notorious place of abode in this county.

I delivered the summons and complaint into hands of _____described as follows: Age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

■ **(CORPORATION)** I served the defendant Norfolk Southern Corp. _____, a corporation, by leaving a copy of the within action and summons and complaint with J. Steven Stewart (Registered Agent) in charge of the corporation's office and place of doing business of said corporation in this county.

☐ **(TACK & MAIL)** I have this day served the above styled affidavit and summons on the defendant by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant to answer said summons at the place stated in the summons.

☐ **(NON EST)** I made a diligent search, and I did not find the defendant _____ in the jurisdiction of this Court.

This _8th_ day of ___Sept___, 20_25_.

_____ #1657
Deputy Sheriff

SC-2
Rev'd 1/25

## SHERIFF'S ENTRY OF SERVICE

GWINNETT County, Georgia

🔷 **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**SEP 22, 2025 09:31 AM**

*Danielle F. Forté*
Danielle F. Forté, Clerk
Muscogee County, Georgia

Civil Action No. Muscogee SU25CV1918

Date Filed August 28, 2025

Superior Court ☑
State Court ☐

Consolidated Government of Columbus, Georgia

Attorney's address and email
P.O. Box 1199
Columbus, Georgia 31902-1199
jschley@pagescrantom.com

Plaintiff(s)

V.

Name and Address of Party to be served
C T Corp. System (Registered Agent)

Norfolk Southern Corp.,
Georgia Southwestern Railroad, Inc., et. al.

289 S. Culver St.

Defendant(s)

Lawrenceville, Georgia 30046-4805

Garnishee

*RECEIVED 2025 SEP 18 PH 03: 03 CIVIL DIV. G.S.O.*

☐ **(PERSONAL)** I have this day served the defendant _____ personally with a copy of the within action and summons and complaint.

☐ **(NOTORIOUS)** I have this day served the defendant _____ by leaving a copy of the action and summons and complaint at the defendant's most notorious place of abode in this county.

I delivered the summons and complaint into hands of _____ described as follows: Age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

■ **(CORPORATION)** I served the defendant Georgia Southwestern Railroad, Inc. , a corporation, by leaving a copy of the within action and summons and complaint with C T Corporation System (Registered Agent) *Jane Richardson* in charge of the corporation's office and place of doing business of said corporation in this county.

☐ **(TACK & MAIL)** I have this day served the above styled affidavit and summons on the defendant by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant to answer said summons at the place stated in the summons.

☐ **(NON EST)** I made a diligent search, and I did not find the defendant _____ in the jurisdiction of this Court.

This 17 day of Sep , 20 25 .

*U. Higgins 50541*

Deputy Sheriff

SC-2
Rev'd 1/25

**SHERIFF'S ENTRY OF SERVICE**

GWINNETT _____ County, Georgia

🖥 EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

**SEP 22, 2025 09:31 AM**

*Danielle F. Forte*
Danielle F. Forté, Clerk
Muscogee County, Georgia

Civil Action No. Muscogee SU25CV1918

Date Filed August 28, 2025

Superior Court ☑
State Court ☐

Consolidated Government of Columbus, Georgia
_____

Attorney's address and email
P.O. Box 1199
Columbus, Georgia 31902-1199
jschley@pagescrantom.com

Plaintiff(s)

V.

Norfolk Southern Corp
Genesee & Wyoming Railroad Services, Inc., et. al.

Name and Address of Party to be served
C T Corp. System (Registered Agent)
289 S. Culver St.
Lawrenceville, Georgia 30046-4805

Defendant(s)

Garnishee

☐ **(PERSONAL)** I have this day served the defendant _____ personally with a copy of the within action and summons and complaint.

☐ **(NOTORIOUS)** I have this day served the defendant _____ by leaving a copy of the action and summons and complaint at the defendant's most notorious place of abode in this county.

I delivered the summons and complaint into hands of _____ described as follows: Age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

■ **(CORPORATION)** I served the defendant Genesee & Wyoming Railroad Services, Inc. , a corporation, by leaving a copy of the within action and summons and complaint with C T Corporation System (Registered Agent) Jack Richardson in charge of the corporation's office and place of doing business of said corporation in this county.

☐ **(TACK & MAIL)** I have this day served the above styled affidavit and summons on the defendant by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant to answer said summons at the place stated in the summons.

☐ **(NON EST)** I made a diligent search, and I did not find the defendant _____ in the jurisdiction of this Court.

This 17 day of Sep , 20 25 .

Lt. Higgins 50541
_____
Deputy Sheriff

SC-2
Rev'd 1/25

## SHERIFF'S ENTRY OF SERVICE

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
MUSCOGEE COUNTY, GEORGIA

**SU2025CV001918**

SEP-24, 2025 02:21 PM

Danielle F. Forté, Clerk
Muscogee County, Georgia

RECEIVED
AUG 29 2025
9728
CIVIL PROCESS BCSO

_____ BIBB _____ County, Georgia

Civil Action No. __Muscogee SU25CV1918__

Date Filed __August 28, 2025__

Superior Court ☑

State Court ☐

AUG 2 9 2025

Consolidated Government of Columbus, Georgia
_____

Attorney's address and email

P.O. Box 1199

Columbus, Georgia 31902-1199

jschley@pagescrantom.com

Plaintiff(s)

V.

Norfolk Southern Corp.,

The South-Western Rail Road Co., et. al.

Name and Address of Party to be served

J. Steven Stewart (Registered Agent)

577 Mulberry St. (1500)

Macon, Georgia 31201

Defendant(s)

_____
Garnishee

☐ **(PERSONAL)** I have this day served the defendant _____ personally with a copy of the within action and summons and complaint.

☐ **(NOTORIOUS)** I have this day served the defendant _____ by leaving a copy of the action and summons and complaint at the defendant's most notorious place of abode in this county.

I delivered the summons and complaint into hands of _____described as follows: Age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

■ **(CORPORATION)** I served the defendant __The South-Western Rail Road Company__, a corporation, by leaving a copy of the within action and summons and complaint with __J. Steven Stewart (Registered Agent)__ in charge of the corporation's office and place of doing business of said corporation in this county.

☐ **(TACK & MAIL)** I have this day served the above styled affidavit and summons on the defendant by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant to answer said summons at the place stated in the summons.

☐ **(NON EST)** I made a diligent search, and I did not find the defendant _____ in the jurisdiction of this Court.

This __8th__ day of _____Sept_____, 20__25__.

_____ #1657
Deputy Sheriff

SC-2
Rev'd 1/25