IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA, | * * * |
| Plaintiff, | * * |
| v. | * Case No.: 4:25-cv-00312-CDL |
| | * |
| NORFOLK SOUTHERN CORP., NORFOLK SOUTHERN RAILWAY COMPANY, CENTRAL OF GEORGIA RAILROAD COMPANY, THE SOUTH-WESTERN RAIL ROAD COMPANY, GENESEE & WYOMING RAILROAD SERVICES, INC., COLUMBUS & CHATTAHOOCHEE RAILROAD, INC., and GEORGIA SOUTHWESTERN RAILROAD, INC., | * * * * * * * * * * |
| Defendants. | * |

**COLUMBUS' SURREPLY IN OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

Plaintiff Consolidated Government of Columbus, Georgia ("Columbus"), by and through counsel and pursuant to leave granted by the Court [ECF No. 25], hereby files this surreply in opposition to Defendants Norfolk Southern Corp., Norfolk Southern Railway Co., Central of Georgia Railroad Co., and The South Western Rail Road Co.'s Motion to Dismiss [ECF No. 9] and Defendants Genesee & Wyoming Railroad Services, Inc., Columbus & Chattahoochee Railroad, Inc., and Georgia Southwestern Railroad, Inc.'s Motion to Dismiss [ECF No. 10] (all Defendants hereinafter collectively "Railroads").

**-- SURREPLY --**

Columbus seeks to enforce a voluntary agreement with the Railroads regarding real property. The Railroads now argue that Columbus' requested remedy would "unreasonably burden

railroad operations" and that Columbus' claims have, therefore, been impliedly preempted by the ICC Termination Act ("ICCTA"). The Railroads are wrong and fail to show any unreasonable interference with their operations. The motion should be denied and the case remanded.

I. **The Railroads Forfeited Any Argument of Implied Preemption**

In their initial briefs, the Railroads argued only that Columbus' state law claims were completely preempted based on *expressed* preemption. *See generally* [ECF Nos. 9-1 and 10]; *see also* [ECF No. 13 at ¶ 3]. Then, in their reply, the Railroads' argue for preemption under the ICCTA asserting that Columbus' claims are preempted because the requested remedy of ejectment would "unreasonably burden railroad operations," which is the "generally accepted test of ICCTA *implied* or conflict preemption ...." *PCS Phosphate Co., Inc. v. Norfolk Southern Corp.*, 559 F.3d 212, 220-21 (4th Cir. 2009) (emphasis added); *see also Franks Inv. Co. LLC v. Union Pacific R. Co.*, 593 F.3d 404, 413-14, n. 6 (5th Cir. 2010) (en banc) (recognizing "unreasonable interference" test for implied preemption and collecting circuit cases for the same); *see also Dodger, LLC v. CSX Transp., Inc.*, No. 1:16-cv-144-WLS, 2018 WL 1456629, at *4 n. 3 (M.D. Ga. Jan. 29, 2018) *citing Fla. East Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1330-31 (11th Cir. 2001) ("unless a legal remedy is expressly preempted by the ICCTA, it is only preempted impliedly if it would unreasonably burden rail transportation" and collecting circuit cases for the same).

The Railroads did <u>not</u> raise implied preemption in their initial briefs [ECF Nos. 9-1 and 10] or in their notice of removal [ECF No. 1]. Therefore, all of the Railroads' arguments for implied preemption based on unreasonable interference, as asserted in their replies [ECF Nos. 21 and 23], are "too late" and should not be considered. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682-83 (11th Cir. 2014) *citing Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008).

## II. Columbus' Claims Do Not Unreasonably Interfere with Rail Operations

### A. The Railroads Fail to Show Any Evidence of Unreasonable Interference

Implied preemption based on unreasonable interference is a fact-intensive analysis, and the Railroads have the burden of supplying those facts to the Court. *See 2145 Avocado Land Tr. v. Fla. E. Coast Ry., LLC*, No. 6:24-cv-1691-PGB-RMN, 2025 WL 2369500, at *5 (M.D. Fla. Aug. 14, 2025) ("determining whether the ICCTA impliedly preempts Plaintiffs' trespass claim is a fact-based assessment that is inappropriate at this stage of the case [on a motion to dismiss]") *citing Franks*, 593 F.3d at 413-15. The Railroads cite to non-mandatory authority where implied preemption was determined based on evidence submitted by the railroads. *See Wichita Terminal Ass'n, BNSF Ry. Co. & Union Pacific R. Co.—Pet. for Decl. Order*, No. FD 35765, 2015 WL 3875937, at *2, *3 n. 20 (S.T.B. June 23, 2015)[1] (petition to the STB after eleven years of state court proceedings included numerous evidentiary exhibits filed by the railroad); *see also CSX Transp. v. City of Sebree, Ky.*, 924 F.3d 276, 282, 286 (6th Cir. 2019) (a trial on the merits was conducted at which the court heard testimony as to interference with rail operations). Here, the Railroads argue preemption without citation to any testimony or documentary evidence because this case remains in the pleadings stage. *See* Order [ECF No. 20]. Therefore, there is a lack of sufficient evidence for a finding of implied preemption, and the Railroads' have not met their burden of showing unreasonable interference in this case. *See Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 813 (5th Cir. 2011) ("Our inquiry is 'fact-based,' and [the defendant railroad] must come forward with evidence of the specific burdens imposed .... General evidence ... is insufficient"); *see also Dodger, LLC*, 2018 WL 1456629, at *6 *citing Elam*, 635 F.3d at 813.

---

[1] The Fifth Circuit held decisions by the S.T.B. "regarding the preemptive effect of the ICCTA and the test it uses to determine preemption are not binding on [the court]." *Franks*, 593 F.3d at 413 *relying on Wyeth v. Levine*, 555 U.S. 555, 576-77 (2009).

Due to the lack of evidence supporting implied preemption, and since the Eleventh Circuit narrowly construes preemption under the ICCTA (*see Fla. E. Coast*, 266 F.3d at 1327-1331), this case should be remanded to state court. *See Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("...removal statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand").

### B. A Parcel-By-Parcel Analysis Shows Any Interference With Rail Operations Would Not Be Unreasonable

Columbus rejects, as a factual matter, that its claims would result in unreasonable interference with rail operations. To be clear, the Complaint sets out that Columbus seeks ejectment in regards to two distinct railyards: the Upper Railyard and the Lower Railyard. *See* Compl. [ECF No. 1-2] at ¶¶ 54, 72, 101-112]. The Upper Railyard consists of four parcels of real property, and Columbus asserts claims to only three of those parcels.[2] *Id.*; *see also id.* at 67. Specifically, Columbus has not asserted any claims to the parcel identified as parcel "E" in the map of the Upper Railyard, which is attached as an exhibit to Exhibit "A" of the Complaint. *Id.* The Railroads acknowledge this parcel consists of about "12.6 Acres" and show it includes the critical northern point of ingress and egress for the Upper Railyard. *See* [ECF No. 9-1, at 9]. Also, Columbus has not asserted any claims to the southern point of ingress and egress to the Upper Railyard. *Id.*; *see generally* Compl. [ECF No. 1-2]. Therefore, even if Columbus prevails on all of its claims, the Railroads will continue to control substantial real property in and around the Upper Railyard. Only one of the parcels at issue (the Third Depot Lot labeled as parcel "C" on the map attached to the

---

[2] In an attempt to argue that Columbus' claim would interfere with rail operations, the Railroads alter their interpretation of the potential impact of Columbus' claims on the railyard: in their Notice of Removal [ECF No. 1], the Railroads assert that "Columbus seeks to eject Norfolk Southern from ... *almost* the entire Columbus railyard ...." *Id.* at ¶ 20 (emphasis added). Then, in their briefs in support of dismissal, the Railroads argue the "entire ... railyard" is at risk under Columbus' claims. [ECF No. 9-1, at 9]; [ECF No. 21, at 3].

4

Complaint [ECF No. 1-2, at p. 67; *also* at ¶¶ 44-48]) is positioned to provide a connection between the Railroads' uncontested property at the northern and southern points of ingress and egress to the Upper Railyard. The Railroads have made no arguments concerning interference with the Lower Railyard—signaling their lack of concern for that property and the claims against it.

Columbus' claims are asserted on a parcel-by-parcel basis; likewise, the legal analysis of preemption should be applied to each claim and parcel. As applied, there can be no unreasonable interreference with the Railroads' operations because substantial rail lands are not at issue.[3]

### C. A State Law Remedy Exists and Precludes Unreasonable Interference with Rail Operations

As the Sixth Circuit recently recognized, "a state action avoids preemption when the railroad could, in theory, reclaim use of its property." *Norfolk S. Ry. Co. v. Dille Rd. Recycling*, 94 F.4th at 529 *citing Franks*, 593 F.3d at 410. That finding should apply here.

Under Georgia law, the Railroads have the power of eminent domain to secure the right to use any land they may need for operating the railyards through condemnation. *See* O.C.G.A. § 46-8-121; *see also City of Doraville v. S. Ry. Co.*, 227 Ga. 504, 509-13 (1971) (railroads have eminent domain power to condemn city property for railroad purposes). As the Georgia Supreme Court has established, the proper remedy under Georgia law in a trespass suit against an entity with condemnation power is to "'require the defendants to cease and desist *until and unless* [*the land*] *was condemned for public purposes.*'" *Dep't of Transp. v. Mixon*, 312 Ga. 548, 561 (2021) *quoting McFarland v. DeKalb Cnty*, 224 Ga. 618, 619 (1968) (emphasis in original). Therefore, under Georgia law, Columbus may prevail on its claims, and the Railroads can still avoid physical dispossession—and any interference with its rail operations—by condemning whatever property

---

[3] *Norfolk Southern Ry. Co. v. Dille Road Recycling, LLC*, 94 F.4th 517, 527 (6th Cir. 2024) ("Reasonableness ... is a question of the scope of the 'taking.'")

5

they need to continue rail operations. *See Moore v. Equitrans, Ltd. P'ship*, 27 F.4th 211, 217 (4th Cir. 2022) (gas company initiated condemnation of contested property during trespass litigation).

The effect of the remedy here is to give the Railroads a choice: vacate the land *or* condemn and pay for it. Requiring the Railroads to condemn and pay compensation for the land they take is not an unreasonable burden on their operations. *See Fla. East Coast*, 266 F.3d at 1338, n. 11 (nothing in the ICCTA "suggests that any action which prevents an individual firm from maximizing its profits is to be pre-empted").

### III. Implied Preemption Based On Unreasonable Interference Does Not Apply To Columbus' Claims

#### A. The Market Participation Doctrine Shields Columbus' Claims from Preemption

By exchanging land for railroad depot services, Columbus acted in its proprietary capacity as a landowner, not its regulatory capacity as a sovereign. As the Supreme Court has recognized, "preemption doctrines apply only to state *regulation*." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993) ("*Boston Harbor*") (emphasis in original). Even if a voluntary agreement with a state touches on preempted subject matter, the agreement is shielded from preemption unless it is so broad in scope or purpose as to make it "tantamount to regulation." *Id.* (despite impinging on labor issues impliedly preempted by the National Labor Relations Act, a "no-strike" provision in a state agreement was "not government regulation and [] therefore not subject to NLRA pre-emption."). *See also Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 416 (2d Cir. 2002) (despite impinging subject area impliedly preempted by Federal Communications Act, provision in lease agreement restricting type of antenna that could be installed on state-provided property was not preempted).

This doctrine, called the "market participant doctrine," is a general rule that has been

applied to limit preemption in a multitude of federal statutes. *See id.* (Federal Communications Act and Telecommunications Act); *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011 (9th Cir. 2010) (ERISA); *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074 (9th Cir. 2017) (Railway Labor Act and NLRA); *Sw. Airlines Co. v. City of San Antonio*, 752 F. Supp. 3d 635 (Airline Deregulation Act); *Engine Mfrs. Ass'n v. S. Coast Air Quality Maint. Dist.*, 498 F.3d 1031 (Clean Air Act); *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686 (5th Cir. 1999) (Federal Aviation Administration Authorization Act). The ICCTA is no different. As the Surface Transportation Board itself has correctly recognized, the doctrine applies to the ICCTA. *Cal. High-Speed Rail Auth. — Petition for Declaratory Order*, No. 35861, 2014 WL 7149612, at *12 (S.T.B. Dec. 12, 2014) (recognizing doctrine "shields [proprietary] state action from federal [ICCTA] preemption.").

In assessing whether the terms of a voluntary agreement are "tantamount to regulation," and thus subject to preemption, courts have widely adopted a two-prong test that examines: (1) whether the agreement reflects a proprietary interest, "as measured by comparison with the typical behavior of private parties in similar circumstances," and (2) whether the scope of the challenged provision is limited to the transaction at hand or reaches beyond it. *City of Bedford*, 180 F.3d at 693. The test is applied "disjunctively," meaning if either prong is satisfied, the market participant doctrine applies. *Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215, 221 (6th Cir. 2018).

Applied to the transaction here, Columbus was acting in a proprietary capacity. The Railroads approached Columbus seeking land, not a permit. *See* Compl. [ECF No. 1-2] at ¶¶ 18-21, 33-34, 44-45, 56-59, 64-65. Columbus, as any private party can do, placed reversionary

7

conditions on the exchange to protect its interests in the transactions.[4] *See Sprint Spectrum*, 283 F.3d at 416 (government acts in a proprietary capacity when it sells or leases its own land to a service provider).

In this context, the reversionary conditions here are not so broad as to be tantamount to regulation. Having provided valuable land, the reversionary conditions protected Columbus' proprietary interest as benefactor in ensuring the resources it provided were efficiently used for their intended purpose, and in ensuring it received its end of the bargain in the form of depot services that would benefit the city. *See, e.g., Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 35 (D.C. Cir. 2002) (state has a proprietary interest as a benefactor in ensuring that resources it provides to a project are "used efficiently."); *Healthcare Ass'n of N.Y. State v. Pataki*, 471 F.3d 87, 109 (2d Cir. 2006) ("The State's articulated concern, getting what it paid for, is a quintessentially proprietary concern."). Further, the scope of the reversionary clauses was limited to the land involved in the transaction, confirming its proprietary nature. *See Sprint Spectrum*, 283 F.3d at 420 (condition in property agreement deemed propriety when scope was restricted to the property involved). Under either prong, the transaction at issue here reflects proprietary action.

By granting the Railroads land subject to reversionary interests, Columbus did not regulate; instead, it acted in a proprietary manner. Therefore, the market participant doctrine applies.

### B. Congress Did Not Intend to Preempt Voluntary Agreements

Outside the context of the market participant doctrine, there appears to be a split as to whether voluntary agreements can ever be subject to implied ICCTA preemption. *Compare, e.g.*,

---

[4] There are numerous contemporaneous instances of property owners, both private and governmental, donating land to railroads subject to reversionary clauses. *See Tamalpais Land & Water Co. v. Nw. P. R. Co.*, 73 Cal. App. 2d 917, 928 (1946) (collecting cases involving private landowners).

8

*Union Pac. R.R. v. Chi. Transit Auth.*, 647 F.3d 675, 682 (7th Cir. 2011) ("no issue of federal preemption" when claim involves "contract or other agreement."), *with CSX Transp. v. City of Sebree*, 924 F.3d at 287 (finding agreement preempted, but conflating preemption with distinct doctrine of void-as-contrary-to-public-policy). Importantly, none of the cases finding voluntary agreements impliedly preempted addresses the threshold question of whether Congress *intended* to preempt voluntary agreements, *see Transource Pa., LLC v. Defrank*, 156 F.4th 351, 372 (3d Cir. 2025) ("the intent of Congress is the 'ultimate touchstone'" of preemption), and, if so, why Congress chose to expressly limit ICCTA preemption to regulations.

In this Circuit, "when Congress has explicitly addressed preemption in a statute, an implication arises that it did not intend to preempt other areas of state law." *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 920 (11th Cir. 2020). That controls here. When Congress promulgated the ICCTA, it knew exactly what language to use to preempt voluntary agreements (by preempting "all other law") and exactly how to achieve a more "limited" preemption (by preempting only "regulations"). *See Fla. East Coast*, 266 F.3d at 1330-31. Specifically, contemporaneous Supreme Court decisions had settled that the phrase "all other law" was " broad enough to preempt ... obligations imposed by contract", *Norfolk & W. R. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991), whereas language focused on "regulations" would result in a "limited" preemption, *Morales v. TWA*, 504 U.S. 374, 385 (1992) ("had the statute been designed to pre-empt state law in such a limited fashion, it would have forbidden the states to '*regulate* rates, routes, and services.'") (emphasis in original). Congress chose the latter for the ICCTA, signaling its intent to limit preemption to regulations, not voluntary agreements.[5]

---

[5] Under well-established Georgia law, the Railroads voluntarily agreed to the reversionary conditions by accepting land with notice of the conditions. *See, e.g., Bowman v. Walnut Mt. Prop.*

9

## IV. The ICCTA Cannot Displace the Constitutionally Protected Right-to-Exclude

What the Railroads refer to as "ousting" them from property is, in constitutional terms, a property owner exercising its right-to-exclude. "The government may not appropriate a property owner's right to exclude." *Cable Holdings of Ga. v. McNeil Real Estate Fund VI*, 953 F.2d 600, 605 (11th Cir. 1992). The Railroads' assertion that the ICCTA does precisely that would, if accepted, raise substantial questions about the ICCTA's constitutionality, at least as applied to property rights that vested before its passage.[6] *See Id.* (avoiding interpretation of statute that would result in appropriation of the right-to-exclude). It is unlikely that Congress intended impliedly to grant rail operators a constitutionally-suspect "super-condemnation" power—to use property they do not legally own, without following any procedural safeguards or paying compensation. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 158 (2021) ("[T]he right to exclude is [not] an empty formality, subject to modification at the government's pleasure. On the contrary, it is a fundamental element of the property right [protected by the Fifth Amendment] that cannot be balanced away.") (internal citations omitted). On the scale of reasonableness, the right-to-exclude "cannot be balanced away," *id.*, and Columbus' claims cannot be unreasonable.

## -- CONCLUSION --

Columbus' claims to exclude the Railroads from city property are not preempted, expressly or impliedly. Therefore, the motions should be denied and this case remanded to state court.

[SIGNATURE PAGE FOLLOWS]

---

*Owners Ass'n*, 251 Ga. App. 91, 96 (2001) ("By accepting a deed with covenants and restrictions, the grantee voluntarily consents to be bound by such ...").

[6] To the extent a line of cases, *e.g.*, *Preseault v. ICC*, 494 U.S. 1, 11 (1990), suggests there is no constitutional violation where the property owner has a mechanism to pursue payment, those decisions have been overruled by *Knick v. Township of Scott*, 588 U.S. 180, 193 (2019). *See Knick*, 588 U.S. at 218 (Kagan, J., dissenting) (noting majority opinion undermines *Preseault* and others).

This 5th day of January, 2026.

                                      PAGE, SCRANTOM, SPROUSE,
                                      TUCKER & FORD, P.C.

                                      By: */s/ Jack P. Schley*
                                                James C. Clark, Jr.
                                                Ga. Bar No. 127145

1111 Bay Avenue, Third Floor    (Office)    Thomas F. Gristina
P.O. Box 1199                            (Mailing)   Ga. Bar No. 452454
Columbus, Georgia 31902                     Jack P. Schley
(706) 324-0251                                      Ga. Bar No. 891829
jclark@pagescrantom.com
tgristina@pagescrantom.com
jschley@pagescrantom.com

                                      By: */s/ Clifton C. Fay*
                                              Clifton C. Fay
                                              Ga. Bar No. 256460
P.O. Box 1340                                        Lucy T. Sheftall
Columbus, Georgia 31902                     Ga. Bar No. 639813
cfay@columbusga.org
lsheftall@columbusga.org

                                      *Counsel for Plaintiff Consolidated Government of*
                                      *Columbus, Georgia*

## CERTIFICATE OF SERVICE

I do hereby certify that I am counsel for Plaintiff and that on this date I filed the foregoing document using the ECF system, which will automatically send notification of such filing to all counsel of record.

This 5th day of January, 2026.

/s/ *Jack P. Schley*
Counsel for Plaintiff